CASE 33—AGREED CASE—JUNE 23.

# Sinking Fund Commissioners, Etc. v. George, Etc.

APPEAL FROM FRANKLIN CIRCUIT COURT.

1. CONSTITUTIONAL LAW—ACT CREATING PRISON BOARD—EXECUTIVE AND LEGISLATIVE FUNCTIONS.—The act of March 5, 1898, creating a Board of Penitentiary Commissioners, is not unconstitutional in that it devolves upon the General Assembly the duty of electing the commissioners whose duties are defined by the act. Appointment to office is not necessarily an executive function.

2. SAME—EMERGENCY CLAUSE—PASSAGE OVER EXECUTIVE VETO.—A bill containing an emergency clause becomes a law immediately upon its passage over the governor's veto.

3. SAME—ELECTION OF COMMISSIONERS IN JOINT ASSEMBLY.—Section 1 of the act providing that such commissioners should "be elected by the General Assembly" did not require either (1) separate action by the two houses, or (2) a resolution approved by the governor for joint action. Joint action without executive approval was sufficient.

4. SAME—TERM OF OFFICE, SIX YEARS.—So much of sec. 1 of the act as provides for a term of six years for one of the commissioners is a violation of the Constitution, sec. 107, limiting the General Assembly in creating offices to a term not exceeding four years;' but such provision in the statute is a separable one and may be rejected without invalidating the remainder of the act.

W. S. PRYOR FOR APPELLANTS.

1. The act creating the prison board is a violation of sec. 107 of the Constitution in that it creates a six-year office.

2. The penitentiary officials in office when the act was passed could not be deprived of their offices during the terms for which they were elected without charges. *Ex parte* Hennen, 13 Pet., 225.

W. H. HOLT ALSO FOR APPELLANTS.

1. The act in question is not operative to devest the titles of the warden and other officials holding under the Board of Commis-

sioners of the Sinking Fund at the time of the passage of the act. Todd v. Dunlap, 99 Ky., 449; 18 Ky. Law Rep., 329; Frankfort v. Brawner, 100 Ky., 166; 18 Ky. Law Rep., 684; South v. The Commissioners of the Sinking Fund, 86 Ky., 186.

2. The appellees were not elected by the House and Senate acting separately, but in a so-called general session and the joint resolution for such purpose had not been approved by the governor or passed over his veto. Constitution, sec. 89.

3. If the act be valid, it did not take effect until ninety days after the expiration of the legislative session at which it was passed. Constitution, secs. 55, 46, 88, 27, 28, 29, 69, 107, 109; Cooley Const. Lim. (4th ed.), pp. 187-189; Logan v. State, 3 Heisk, 444; State v. Kennon, 7 Ohio, 560; Achlege's case, 4 Abbott's Prac. Rep., 35; French v. State (Ind.), 29 L. R. A., 113; Taylor v. Com., 3 J. J. M., 401; City of Louisville v. Wilson, 99 Ky., 598; 18 Ky. Law Rep., 427; 19 Am. & Eng. Enc. of Law, 389; McArthur v. Nelson, 81 Ky., 67; Bunn v. People, 45 Ill., 397.

BRONSTON & ALLEN FOR APPELLEES.

1. The act in question is not unconstitutional in violating secs. 27-8 dividing the powers of the government into three distinct departments. Cooley Const. Lim., (3d ed.), pp. 86-7, 114, 115; Same (6th ed.), p. 104; People v. Draper, 15 N. Y., 54; Swift v. Tyson, 16 Peters, 18; Field v. People, 2 Scam., 80; Slack v. Maysville & Lexington R. R. Co., 13 B. M., 21-24; People v. Freeman, 80 Cal., 233; 13 Am. St. R., 123; Taylor v. Commonwealth, 3 J. J. M., 401; McArthur v. Nelson, 81 Ky., 67; South v. Sinking Fund Commissioners, 86 Ky., 186; Marion County v. L. & N. R. R. Co., 91 Ky., 388; People v. Langdon, 8 Cal., 15; People v. Fitch, 1 Cal., 536; Ross v. Whitman, 6 Cal., 364; People v. Tetlow, 37 Cal., 625; In re Bulger, 45 Cal., 556; Sturgis v. Spofford, 45 N. Y., 446; People v. Woodruff, 32 N. Y., 364; People v. Draper, 15 N. Y., 532; Daily v. City of St. Paul, 7 Minn., 396; State v. Seymour, 35 N. J. L., 54; People v. Hurlburt, 24 Mich., 44; Mayor of Baltimore v. State, 13 Md., 376; s. c., 74 Am. Dec., 572; Davis v. State, 7 Md., 161; State v. Constantine, 42 O. St., 441; Ohio v. Covington, 29 O. St., 102; Walker v. City of Cincinnati, 21 O. St., 14; s. c., 8 Am. Rep., 24; State v. the Judge, 21 O. St., 1; Contra, State v. Kennon, 7 O. St. Rep., 547; State v. Harrison, 113 Ind., 234; 3 Am. St. Rep., 1; Board v. Bunting, 111 Ind., 143; State v. Harrison, 116, same, 300; Pollock v. Bridgeport, 114 N. S., 411; 119 Ind., 386; Contra,

Evansville v. State, 118 Ind., 426; 4 L. R. A., 93; State v. Hyde, 121 Ind., 20; State v. Denny, 118 Ind., 382; 4. L. R. A., 79; State v. Denny, 118 Ind., 449; 4 L. R. A., 65; State v. Peel, 121 Ind., 495; State v. Girley, 122 Ind., 17; overruled in French v. State, *ex rel*, Harlay, 29 L. R. A., 114; Board of Commissioners v. Gwin, 22 L. R. A., 412; State v. Barbour, 53 Conn., 76; 55 Am. Rep., 65; State v. Swift, 11 Nev., 128; State v. Irvine, 5 Nev., 11; Com. v. Handley, 9 Penn. St., 513; Com. v. Baxter, 38 Penn. St., 263; Moers v. The City of Reading, 21 Penn. St., 188; Cronise v. Cronise, 54 Penn. St., 255; People v. Bledsoe, 68 N. C., 457; People v. McKee, 68 N. C., 429; People v. Wright, 6 Col., 92; Martin v. Hunter, 1 Wheat., 304; Cohens v. Virginia, 6 Wheat., 264; Ogden v. Saunders, 12 Wheat., 213; People v. Board, 100 Ill., 495; People v. Henderson, 22 L. R. A., 751; Fox v. McDonald, 21 L. R. A., 537; Stone v. Wilson, 19 Ky. Law Rep., 126.

2. The Commissioners of the Sinking Fund derived their power to act *ex officio* as directors of the penitentiary and being subject to legislative will could have such power withdrawn at any time by like exercise of power, and the withdrawal of this power carried with it necessarily the appointments of subordinate officials made under it. Smith v. Crutcher, 92 Ky., 586; South v. Commissioners of Sinking Fund, 86 Ky., 189; Auditor v. Hardin, 8 B. M., 648; McArthur v. Nelson, 81 Ky., 67.

3. And necessarily took effect and became operative upon its passage over the veto of the governor. Cooley Const. Lim., 156; Constitution, secs. 46, 55, 88; Biggs v. McBride, 5 L. R. A., 115; Re Welman, 20 Vt., 653; Hamlet v. Taylor, 5 Jones, L., 36; Tarlton v. Peggs, 18 Ind., 24; Goodsell v. Boynton, 2 Ill., 555; State v. Click, 2 Ala., 26; Re Richardson, 3 Story, 571; The Ann., 1 Gall., 62; Rathbone v. Bradford, 1 Ala., 312; Smets v. Wetherbee, R. M. Charlt., 537; People v. Clark, 1 Cal., 406; Baker v. Compton, 52 Lex., 252; Logan v. State, 3 Heisk., 442.

4. If so much of the act creating the six years' office be a violation of sec. 107 of the Constitution, then the act may be given effect separating the constitutional from the unconstitutional provisions.

5. The objection that there was no authority to elect the commissioners in joint session may be answered that there was no provision in the act complained of requiring a joint resolution within the meaning of sec. 80 of the Constitution.

Sinking Fund Commissioners, etc., v. George, etc.

W. S. TAYLOR, W. S. PRYOR AND WM. H. HOLT FOR APPELLEES
IN A PETITION FOR A REHEARING.

> The position asserted in the opinion of the court that the
> Legislature has plenary power for all purposes of civil govern-
> ment is unsound. Subject to constitutional limitations, it has
> plenary powers for all legislation and no more.

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

Several important constitutional questions are involved
in this case. During the last session of the Legislature
an act was passed, entitled "An act to create a Board of
Penitentiary Commissioners and regulate the penal insti-
tutions of this Commonwealth." Section 1 reads as fol-
lows: "That a board of commissioners is hereby created
to govern the penitentiaries of this Commonwealth. Said
board shall consist of three members, to be elected by
the General Assembly on or before the 10th day of March,
1898. One of whom shall hold his office to be determined
by lot of commissioners elected, for the term of two years,
one for the term of four years and one for the term of
six years, or until their successors are elected and quali-
fied. * * * *" It is contended that the Legislature
could not constitutionally pass the act and elect the com-
missioners; that the election of the commissioners is an
executive, not a legislative, function. There is no ex-
press power conferred upon the executive department
by the Constitution to appoint such officers or agents
which the General Assembly may designate for the direc-
tion or control of the penitentiaries. Neither is such
power implied from any provision of the Constitution.
There is no provision of the Constitution which places
any limitation on the power of the legislative department
to name or select the officers or agents necessary to prop-
erly manage the penal institutions. Neither is there
any provision of the Constitution from which it can be

fairly implied that the legislative department shall not elect or select those who may aid or control in the conduct of the affairs of the penal institutions. When the Constitution has imposed no limits upon the legislative power, it must be considered practically absolute. Plenary power in the Legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is the exception. When one questions the legislative power to pass a statute, he should show that the Constitution expressly prohibits its enactment, or that such prohibition is fairly implied from its provisions. The court said in the case of Slack, &c., v. Maysville & Lexington R. R. Co., 13 Ben Monroe, 22, that: "It would be difficult, perhaps impossible, to define the extent of the legislative power of the State, unless by saying that, so far as it is not restricted by the higher law of the State and Federal Constitutions, it may do everything which can be effected by means of a law. It is the great, supervising, controlling, creative, and active power in the State, subject to the fundamental restrictions just referred to. Whatever legislative power the whole Commonwealth has is by the Constitution vested in the legislative department, which, representing the popular majorities in the several local divisions of the State, and under no other restraint but such as is imposed by the fundamental law, by its own wisdom, and its own responsibilities, may regulate the conduct and command the resources of all, for the safety, convenience, and happiness of all, to be promoted in such manner as its own discretion may determine. The legislative department performs and finishes its office by the mere enactment of a law. It does not of itself carry the law into operation. This

is necessarily done by extrinsic agencies. The law, being made known, may be universally observed or obeyed. It may be enforced by the judiciary, or by the co-operation of the judiciary and the executive. These are the regular agencies provided by the Constitution for the execution of the laws. But the Legislature is not restricted to these agencies. It may select or appoint others, as is often done, when the object of the law is to accomplish local or individual purposes. The agency generally employed for applying the legislative will and the power of the government to purposes merely local has been that of county courts for counties, and of the trustees of towns or the municipal authorities of cities for towns or cities, which, to the extent of the powers permanently or temporarily vested in them, and whether allowed a discretion or not, do but carry into effect the legislative will and power. But these local agencies are selected, and some of them created, by the Legislature itself, for the purpose of carrying its power into all parts of the Commonwealth, or into such parts as require its application for their benefit or coercion. And the Legislature may select other agencies for particular purposes, having in view, as it must be presumed to have, the nature of the object to be accomplished, and the fitness of the agency selected." It was said in People v. Draper, 15 N. Y. 543, that: "The people, in framing the Constitution, committed to the Legislature the whole law-making power of the State which they did not expressly or impliedly withhold. Plenary power in the Legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its val-

idity to show that it is forbidden. I do not mean that the power must be expressly inhibited, for there are but few positive restraints upon the legislative power contained in the instrument. * * * It follows that it belongs to the Legislature to arrange and distribute the administrative functions, committing such portions as it may deem suitable to local jurisdictions, and retaining other portions to be exercised by officers appointed by the central power, and changing the arrangement from time to time as convenience, the efficiency of administration, and the public good may seem to require. If a particular act of legislation does not conflict with any of the limitations or restraints which have been referred to, it is not in the power of the courts to arrest its execution, however unwise its provisions may be, or whatever the motives may have been which led to its enactment. There is room for much bad legislation and misgovernment within the pale of the Constitution; but, whenever this happens, the remedy which the Constitution provides, by the opportunity for frequent renewals of the legislative bodies, is far more efficacious than any which can be afforded by the judiciary. The courts can not impute to the Legislature any other than public motives for their acts. If a given act of legislation is not forbidden by express words or by necessary implication, the judges can not listen to a suggestion that the professed motives for passing it are not the real ones. If the act can be upheld upon any views of necessity or public expediency which the Legislature may have entertained, the law can not be challenged in the courts." Chief Justice Marshall said in Fletcher v. Peck, 6 Cranch, 87: "How far the power of giving the law may involve every other power, in cases where the Constitution is silent, never has been, and

perhaps never can be, definitely stated." The General Assembly is elected by the people. Presumably, it knows what laws should be enacted for their benefit, and for the public good. If a law is within constitutional limits, a court can not intervene and declare it invalid because, in its opinion, the law is unwise. Upon this subject Mr. Cooley (Const. Lim. 200, 201) says: "The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not, in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil; but courts can not assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It can not run a race of opinions upon points of right, reason, and expediency with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them."

The legislative department for a great many years retained control over the penitentiary, and during that time, under the law then in force, elected the warden, who had the authority to select his subordinates. The

members of the constitutional convention well knew that the Legislature had been assuming that, under the Constitution, it had the right to so control the penitentiary and elect the warden. Notwithstanding the Legislature had been exercising the right to so elect the warden, the framers of the present Constitution failed to place an inhibition in it against the exercise of such power by the Legislature. Besides, it is provided in section 93, of the Constitution, that "Inferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified." Section 107 of the Constitution provides that "the General Assembly may provide for the election or appointment, for a term not exceeding four years, of such other county or district ministerial and executive officers as may, from time to time, be necessary." Under section 93 of the Constitution, the Legislature could not only provide for inferior State officers, but could designate how they should be *appointed* or *elected*. Section 27 of the present Constitution provides how the powers of government of the Commonwealth shall be distributed. Section 28 of the Constitution declares that no person or persons of one department shall exercise any power belonging to either of the others, except as expressly directed or permitted. These sections are the same as sections 1 and 2, art. 1, of the preceding Constitution, except there has been substituted in section 27 the word "confined" for the word "confided," which was in section 1 of the preceding Constitution; but this change does not alter the meaning of the section. It is these sections upon which counsel for the appellees rely to show that the selection of

the Board of Commissioners is an executive function. These sections do not indicate a purpose upon the part of the framers of the Constitution to limit the power of the Legislature in the matter of selecting or electing officers or agents to carry out its will. We might add at this point that the Legislature has also for a great many years elected a librarian.   We have two instances in which the Legislature has assumed the right to elect persons to fill positions which it has created. So far as we are aware, its right to have done so has never been questioned.   The Legislatures of many of the States of the Union have assumed to exercise substantially the same power as has the General Assembly of Kentucky, in the matter of selecting or electing officers to fill positions which they had created.   It was held in People v. Freeman, 13 American State Reports, 122 [80 Cal., 233; 22 Pac., 173], that it can be done.   Mr. Freeman, in his notes to that case (13 Am. St. Rep., 130), after reviewing the various decisions of the Supreme Courts, says: "The truth is that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive or judicial department.   It is commonly exercised by the people, but the Legislature may, as the law-making power when not restrained by the Constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose.   It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the Legislature, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.   The Legislature, unless inhibited by the Constitution, may exercise its power in

either of the three modes:     (1) It may, by a statute, create an office, and name persons who are to fill it. State v. Seymour, 35 N. J. Law, 48; Daley v. City of St. Paul, 7 Minn, 390; Mayor of Baltimore v. State, 15 Md. 376 [74 Am. Dec., 572]. (2) It may by law create an office, and provide that it shall be filled by election or appointment by the Legislature in joint convention assembled. People v. Langdon, 8 Cal. 1; People v. Fitch, 1 Cal. 536; and the principal case. (3) It may, after creating an office, provide that it may be filled by appointment made by any person or by the members of a voluntary association, as by the members of the chamber of commerce, and the presidents and vice-presidents of the marine insurance companies of a certain city, or by the members of the board of underwriters of such city; nor is it necessary that the persons thus designated be citizens of the United States, and authorized to vote as such. Sturgis v. Spofford, 45 N. Y. 446; In re Bulger, 45 Cal., 556."

It would make this opinion unnecessarily long to cite other authorities touching this question. We are of the opinion that the election of the commissioners was not essentially an executive function, and that the Legislature had the right to elect them.

Before a bill can become a law on its final passage, it must receive the votes of at least two-fifths of the members elected to each house, and a majority of the members voting. Const., sec. 46. Section 88 prescribes the details as to how a bill shall be presented to the governor, as to his signing, or his return of it with his objections, and as to how it can become a law notwithstanding the veto, or his failure to sign it. Section 55 of the Constitution reads as follows: "No act, except general appropriation bills, shall become a law until ninety days

after the adjournment of the session at which it was passed, except in cases of emergency, when by the concurrence of a majority of the members elected to each house of the General Assembly, by a yea and nay vote entered upon their journals, an act may become a law when approved by the governor; but the reasons for the emergency that justifies this action, must be set out at length in the journal of each House." It is contended that although there is an emergency clause in the bill, and passed by the two houses as the Constitution requires, it can not become a law for ninety days unless the governor approves it. If the constitutional convention had intended that the will of the governor was to control in the matter of declaring an emergency, it would simply have said that the governor may declare an emergency, and put the act in force at once. We do not think the language and the spirit of the Constitution make the approval of the governor a condition precedent to the taking effect of an act. The Legislature can pass a bill, and it can, by the plain provisions of the Constitution, become a law without the governor's approval. There may be a great necessity that the act should immediately become a law. And, as the Legislature can pass a bill against the objections of the governor, it seems to us that it was never intended that the governor should have the power, by withholding his approval, to prevent the act from taking effect for ninety days after the adjournment of the General Assembly which passed the act. The governor can delay the time, when the bill shall become a law, ten days, by holding the bill without signing or returning it. It seems to us when an act becomes a law without his approval, it would be strange construction of the Constitution

to allow the time to be postponed when it would take
effect because the governor did not approve it.    The
governor vetoed the bill.    It contained the emergency
clause.    The General Assembly had the same power to
pass the bill with an emergency clause as it had to pass
it without such clause.    And the clause was effective to
put in operation the act.    We think the language used,
to-wit: "when approved by the governor," refers to the
time when the act would take effect if approved by him.
However, when he disapproves it, then it does not take
effect, unless passed, as the Constitution requires, over
his objection.    This being done, it became a law imme-
diately, if the Legislature had declared an emergency.
By considering sections 55 and 88 together, we think the
conclusion we have reached is correct.

It is claimed that the commissioners could not have
been elected except by the respective bodies of the Gen-
eral Assembly, in their separate capacity, the Senate
and House concurring therein; that the joint resolution
authorizing a meeting of the joint assembly for the pur-
pose  of  electing  the  commissioners  should  have
been  approved  by  the  governor  before  it  went
into  effect;  and  that  the  vote  cast  in  the  elec-
tion  of  the  commissioners,  also,  should  have
been approved by him.    The act authorized the General
Assembly to elect the commissioners on or before the
10th of March, 1898, regardless of the wishes of the gov-
ernor.    It was passed over his objections.    By the terms of
the act, it could meet at any time on or before that date.
By a motion in each house a time could have been desig-
nated when the members of the General Assembly could
meet in joint session to elect the commissioners.    The
joint resolution simply answered the purpose of such

motion.    That being the purpose of the joint resolution
of the two houses, it certainly was not necessary to
obtain the approval of the governor, because the General
Assembly had, by the passage of the act, been empowered
to elect the commissioners.    The governor could not in-
validate the election by his disapproval of the result.
The act gave him no voice in the election.    Had the
General Assembly intended that the election of the com-
missioners should be subject to the approval of the gov-
ernor, it would have probably conferred upon him the
right to appoint them.    We are of the opinion that any
action, either by motion, order, or resolution, which the
senate and house might have taken with a view
of meeting in joint session to elect the com-
missioners, could be *done* without presenting it to the
governor.    The governor's official connection with the
matter ceased when the bill became a law.    We are of
the opinion that section 89 of the Constitution was not
violated when the General Assembly proceeded to the
election of the commissioners without the approval of
the governor.    The bill became a law on the 5th day of
March, 1898—five days before the last day upon which
the election should take place.    If the views of counsel
for appellants are correct, the governor could have pre-
vented an election under the act, and thus destroyed it,
by simply holding for six days a resolution fixing the
time when the General Assembly should meet in joint
session to elect the commissioners.    He could not pre-
vent the bill from becoming a law by vetoing it, yet he
could defeat its operation by failing to approve the reso-
lution, or the result of the vote.    We can not agree that
counsel's views on the question are correct.    The com-

[18]

missioners received a majority of the votes of both houses and of each house, and were duly elected.

As the term of Finnell and that of all others elected as successors are for six years, does it follow that the whole act is void? Whether the commissioners are officers or administrative agents, it is not necessary to decide, but we will assume they are officers. Under the provisions of the Constitution, the Legislature was not authorized to fix the terms of officers exceeding four years. The manifest purpose of the act was to take from the commissioners of the sinking fund their control and management of the penitentiaries of the State; and it is equally as clear that the Legislature intended to assume the control and management of the penitentiaries, and to accomplish that purpose through the instrumentality of the board of commissioners which it created. The General Assembly manifested a purpose that one of the terms should be two years, and another should be for four years, and the right to fix these terms can not be questioned. The language employed shows that the General Assembly was willing that one of the commissioners should hold his office for six years—two years longer than the Constitution will permit. As the General Assembly expressed a willingness that one of the commissioners should hold for two years longer than the Constitution permits, it is certainly reasonable to conclude that it was the will of that body that the commissioners should hold for four years, as this term is necessarily included in the longer one which it fixed. To hold the act void in so far as it makes the term six years instead of four, still the balance of the act is complete and enforcible. The purpose and intent of the General Assembly, that the commissioners should manage and control the peni-

tentiaries, can be effectuated by eliminating from the act that part which attempted to make terms six instead of four years. If the Constitution had expressly required that the terms of officers should be fixed at *exactly* four years, and the General Assembly had fixed the terms of the commissioners, respectively, at one, two, and three years, then we could not hold that it was its intention that they should hold for terms of four years. In such state of case, the very fact that the Legislature provided that the terms should be less than that fixed in the Constitution would be a manifestation of an unwillingness of the General Assembly to create the offices and fix their terms at four years. It is different in this case. The General Assembly has not only shown a willingness that the terms shall be as much as four years, but that they shall be six. If the unconstitutional portion of an act can be stricken out, and that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected, it must be sustained. When that part of the act which adds two years to the constitutional term of four years is rejected, there will be three commissioners, one of whom shall hold for a term of two years, and two for a term of four years each, and, in the language of the act, holds "until their successors are elected and qualified." They are the commissioners whom the General Assembly have elected to execute its will as expressed in the act. The commissioners hereafter elected by the General Assembly under the act shall hold their office for four, instead of six, years; or, if the General Assembly desires that the management of the penitentiaries shall be by commissioners, it can make such provisions as it pleases for their elec-

tion. It is said by Mr. Cooley in his work on Constitutional Limitations (211), that: "The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial, but whether they are essentially and inseparably. connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of the statute are capable of being separated, within the meaning of this rule. If a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion."

There can be no doubt that the act repeals the law which made the Commissioners of the Sinking Fund *ex officio* directors of the penitentiaries, and vested in the Board of Commissioners the power to manage and control the affairs of the penitentiaries of the State. Upon the election and qualification of the members of the Board of Commissioners, all authority which was vested in the Commissioners of the Sinking Fund to appoint and remove officers and employes of the penitentiaries ceased, and at that moment the board of commissioners was vested with all the powers which the act conferred upon them.

At the same time the right of the officers and employes of the penitentiaries ceased. "A Warden for each penitentiary shall be elected by the said commissioners." (Section 2.) "It shall be the duty of the commissioners if at any time they deem it necessary to appoint a deputy warden for each penitentiary." Section 6. "The commissioners shall appoint a clerk for each penitentiary." Section 7. "The commissioners shall appoint a chaplain for each penitentiary." Section 9. These requirements as to the appointment of persons to fill the positions named are in accordance with the purpose of the General Assembly to constitute another authority to govern the penitentiaries. The express authority to elect a warden and to appoint persons to the other positions named shows the legislative intent to be that those who then held the positions could no longer do so, and the fact that they did so hold them did not place any restrictions on the Board of Commissioners in the matter of electing a warden, and in the appointment of a clerk, deputy warden, physician and chaplain. The General Assembly repealed the law which authorized the Commissioners of the Sinking Fund to control the management of the penitentiaries, and at the same time, notwithstanding the Commissioners of the Sinking Fund had elected a warden, appointed a deputy warden, clerk, physician and chaplain, in effect declared that the Board of Commissioners should elect a warden, and appoint persons to the other positions. The authority which the General Assembly gave the commissioners to elect a warden and appoint persons to the positions named forces the conclusion that those then holding the positions could not continue to do so, unless elected or appointed by the Board of Commissioners. The act made it the duty of the

Board of Commissioners to appoint a deputy warden, "if at any time they deemed it necessary." If the person holding the place had the right to hold it during the time for which he was appointed, then the Board of Commissioners might deem it wholly unnecessary to have a deputy warden; still he would continue to hold his place, if the position of counsel for appellant be correct. It was by an act of the General Assembly that the Commissioners of the Sinking Fund were made directors of the penitentiaries, and by which their subordinate officers held their positions. They all held subject to the legislative will. That the General Assembly could at any time repeal the law under which they held is no longer an open question in this State. In South v. Commissioners of the Sinking Fund, 86 Ky., 188 [5 S. W. 567], in speaking of the warden of the penitentiary, the court said: "The office in question was not a constitutional one. It is the creature of the Legislature, and subject to its will." The act does not in express terms say that the offices are abolished, but it does repeal the law under which the officers were appointed. If the act under consideration had repealed the law under which they were appointed, without creating an authority to govern the penitentiaries, it could not be contended that the Commissioners of the Sinking Fund and their appointees continued in office. Does the mere fact that the act which repeals the law under which they held their positions provides that the new authority shall call to their aid certain persons who may bear the same official designation and perform the same duties, operate to keep them in office? We think not. The judgment is affirmed.

Judge Burnam dissents.

Judge DuRelle dissents from that part of the opinion

which relates to the joint resolution, and that part which annuls the statute as to the term of office.

Judge DuRelle delivered the following dissenting opinion:

In dissenting from the opinion of the majority in this case, I shall not attempt to do more than give a bare outline of my views upon the subject, and the reasons which have led me to the conclusion reached, without any elaboration of argument or citation of authority.

A number of reasons for holding invalid the act establishing the Board of Prison Commissioners were urged in argument. For example, the act provides that the commissioners shall be elected by the "General Assembly." By section 29 of the Constitution it is provided that "the legislative power shall be vested in a House of Representatives and a Senate, which, together, shall be styled the 'General Assembly of the Commonwealth of Kentucky.'" It was urged that whatever the General Assembly has authority to do must be passed by both houses; that an order, bill, resolution, or vote can be adopted by the General Assembly only by the separate action of each house; that a thing authorized to be done by the General Assembly can not be performed by a joint assembly of the two houses, except in cases where the two houses separately authorize such thing to be done by the joint assembly, for a joint assembly of the two houses is not authorized by the Constitution, no provision being made by that instrument for the holding of such joint assembly, for the officers who shall preside thereat, or for the recording of its transactions; that such provision must therefore be made by the General Assembly (that is to say, by the separate action of the two houses) before a joint assembly can be held; and that this nec-

essity was recognized by the General Assembly in the case at bar, for the two houses separately adopted a resolution to meet in joint assembly for the election of the commissioners. It was conceded that if each house had met separately, and elected the same persons to fill these offices, it would have been an election by the General Assembly, but as they did not so proceed, but desiring to act by joint assembly, and perceiving the necessity of a resolution adopted in each house to authorize the holding of such joint assembly, separately adopted the resolution, it was essential that they should comply with section 89 of the Constitution, which requires that "every order, resolution or vote, in which the concurrence of both houses may be necessary, except on a question of adjournment, or as otherwise provided in this Constitution, shall be presented to the governor, and, before it shall take effect, be approved, by him," etc., and the meeting of the two houses in joint assembly was therefore unauthorized and ineffectual.

A further objection rests in the provision of section 93 of the Constitution, that "inferior State officers, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified," in the teeth of which provision the act in question provided that the first three commissioners elected to these offices should draw lots for the first terms of two, four, and six years, and commissioners elected thereafter should hold for a term of six years. It was zealously urged that the fixing of a term of office at six years was in plain violation of the organic law, and absolutely void; that this objection applied to all three of the commis-

sioners elected, because each one was elected for the six-year term as much as either of the others, and the taint applied equally to all three; and, if this were not so, that, the term for which the commissioner drawing the six-year term was elected being unconstitutional, the board could not act. But I have not thought it essential to consider these objections, for they, as well as the others made in argument, may be passed over as trivial, in comparison with the objection that the act is inherently vicious, as being an invasion by the legislative department of the powers and privileges of the executive.

Immediately after the bill of rights in the Constitution follow the two sections concerning the distribution of the powers of government:

"Sec. 27. The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to-wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

"Sec. 28. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

These provisions, peculiar to the Constitution of Kentucky, have been preserved in the various instruments since the first Constitution was adopted, and have been imitated more or less closely in the Constitutions of other States. The Constitution of the United States provides simply that "all legislative powers herein granted shall be vested in a Congress of the United States," with like provisions as to the vesting of judicial powers in the judiciary, and executive powers in

the president. That is the extent of departmental division under the Federal Constitution. The Kentucky Constitution goes much further; and, had Mr. Jefferson been in America at the time of the adoption of the Federal Constitution, that instrument would, in all probability, have contained the enactment which we find only in the Constitution of Kentucky, with its three distinct provisions: First, that the government shall be divided into three distinct departments; second, that each of them shall be confined to a separate body of magistracy; and, third, that no person or collection of persons shall exercise any power properly belonging to either of the others, except in the instances thereinafter expressly directed or permitted. When Mr. Jefferson returned from France, the Federal Constitution had been adopted; and, having been appointed Secretary of State, he obtained permission to go to ·Monticello for some months. John Breckinridge and George Nicholas paid him a visit there, and informed him that Kentucky was about to frame a Constitution for herself, and that Virginia was about to permit Kentucky to become a separate and independent State. He told them that there was danger in the Federal Constitution, because the clause defining the powers of the departments of government was not sufficiently guarded, and that the first thing to be provided for by the Kentucky Constitution should be to confine the judiciary to its powers, and the legislative and executive to theirs. Mr. Jefferson drew the form of the provision, and gave it to Nicholas and Breckinridge; and it was taken by Nicholas to the convention which met at Danville, and there presented—Breckinridge not being present at the convention. There was much discussion and dissent when the article was offered, but, when its author

was made known, the respect of Kentucky for the great name of Jefferson carried it through, and it was at once adopted.

A similar question to the one under consideration had arisen under the Federal Constitution in 1791, and its discussion may have been suggestive to Mr. Jefferson, and aided in crystalizing his views into the form in which they have come down to us. At the first session of the Federal Congress an act was passed conferring executive powers upon the judiciary, which the Federal judges in a number of circuits refused to obey. The act provided that the Supreme Court and the subordinate judges should perform the executive duty of making a list of invalid pensioners—should investigate the facts, and make a list of names of persons entitled to pensions under the act. Application was made by invalid soldiers in New York and Philadelphia to have their names put upon this list. The judges of the Circuit Court for the district of Pennsylvania (Wilson, Blair and Peters) addressed a letter to the president in regard to the act in which, deploring the necessity for their action, they laid before President Washington "the sentiments which on a late painful occasion" governed them in regard to this act. They then said: "It is a principle important to freedom that, in government, the judicial should be distinct from and independent of the legislative department. To this important principle the people of the United States, in forming their Constitution, have manifested the highest regard. * * * Upon due consideration, we have been unanimously of the opinion that under this act the Circuit Court held for the Pennsylvania district could not proceed: (1) Because the business directed by this act is not of a judicial nature. It forms no part of the power

vested by the Constitution in the courts of the United
States. The Circuit Court must consequently have pro-
ceeded without constitutional authority. * * * These,
sir, are reasons of our conduct. Be assured that, though
it became necessary, it was far from being pleasant. To
be obliged to act contrary either to the obvious directions
of Congress, or to a constitutional principle in our judg-
ment equally obvious, excited feelings within us we hope
never to experience again." Judges Iredell and Sit-
greaves, of the Circuit Court for the district of North
Carolina, addressed a similar letter to the president, in
which, expressing their regret that the occasion for their
action had arisen, they stated the proposition that the
"legislative," executive and judicial departments are each
formed in a separate and independent manner, and that
the ultimate basis of each is the Constitution only, within
the limits of which each department can alone justify
any act of authority." The Circuit Court for the district
of New York (Jay, Chief Justice; Cushing, Justice, and
Duane, District Judge) took the act into consideration,
and were unanimously of opinion and agreed: "That by
the Constitution of the United States the government
thereof is divided into three distinct and independent
branches, and that it is the duty of each to abstain from
and oppose encroachments upon either. That neither
the legislative nor executive branches can constitution-
ally assign to the judiciary any duties but such as are prop-
erly judicial, and to be performed in a judicial manner.
That the duties assigned to the Circuit Courts by this
act are not of that description. * * * As, therefore,
the business assigned to this court by the act is not
judicial, nor directed to be performed judicially, the act
can only be considered as appointing commissioners for

the purposes mentioned in it, by official instead of per-
sonal descriptions. That the judges of this court re-
gard themselves as being the commissioners designated by
this act, and therefore as being at liberty to
accept or decline that office." (2 Dall., 409.) They
thereupon, in view of the benevolent nature of the
act, decided to execute it in the capacity of commission-
ers. It will be observed that, under the Constitution
of Kentucky, this could not have been done, on account
of the provision in the 28th section that "no person
or collection of persons, being of one of those depart-
ments, shall exercise any power properly belonging to
either of the others, except," etc. No such provision be-
ing in the Federal Constitution, while the judges, as
judges, could not execute the act, there was no inhibi-
tion contained in the Constitution against their executing
it as commissioners. President Washington adopted the
suggestion made in the letters referred to, sending a mes-
sage to Congress, and the obnoxious law was repealed.
So much for the history of this provision of the organic
law.

What has been done in this case? Under a constitu-
tional grant of authority (section 93), that inferior State
officers not, specifically provided for in the Constitution
may be appointed or elected in such manner as may be
prescribed by law, the Legislature, instead of prescrib-
ing the manner in which these officers shall be elected,
has undertaken to authorize their appointment by itself.
That the persons who may be appointed to these posi-
tions are officers, within the meaning of the Constitution,
seems to me to admit of little doubt. They are clothed
with extraordinary powers; they may appoint officers, for
cause remove them, make and annul contracts, handle

and control public funds; they are required to execute
bond and take the oath of office; and they receive a sal-
ary from the public treasury.  These powers and duties
seem clearly to bring them within the definition given
by the chief justice in City of Louisville v. Wilson, 99 Ky.
598 [36 S. W. '944], where it was said:    "There are
various tests by which to determine who are officers, in
the meaning of the law; but at last, in case of uncer-
tainty, the intention of the lawmakers controls.  To con-
stitute an officer, it does not seem to be material whether
his term be for a period fixed by law, or endure at the
will of the creating power; but if an individual be in-
vested with some portion of the functions of the govern-
ment, to be exercised for the benefit of the public, he is a
public officer."  Surely, in performing the duties and ex-
ecuting the powers imposed and given by this act, these
persons are invested "with some portion of the functions
of the government, to be exercised for the benefit of the
public."  By section 29 of the Constitution the "legisla-
tive power" is vested in a House of Representatives and
a Senate, which are together styled the "General Assem-
bly of the Commonwealth."  This grant vests the Legis-
lature with all legislative power; that is to say, every-
thing that may be properly done by law may be performed
by the Legislature.  But appointment to office has been
held by this court to be "intrinsically executive."  Said
Chief Justice Robertson:  "And, although the Constitu-
tion has confided to the courts the appointment of their
own clerks, still the nature of the power is not changed.
It is essentially executive, whensoever or by whomsoever
it may be exercised.  It is as much executive when exer-
cised by the courts as by the governor.  It is the preroga-
tive of appointing to office, and is of the same nature,

whether it belonged to a court or to a governor." Taylor v. Com., 3 J. J. Marsh. 401. Under the Constitution in force at the date of that opinion, the court was authorized to appoint its clerk. It is expressly directed and permitted to the Legislature by the Constitution to perform certain specified executive and judicial functions. For instance, the two houses are authorized to elect their own officers (secs. 34 and 249)—an executive act expressly provided for. Each house is empowered to judge of the qualifications, elections, and returns of its members (section 38),—a judicial act. So it may punish for disorderly behavior, and expel members. Section 39. So it appears that it was deemed necessary by the framers of the Constitution to expressly direct and permit the Legislature to exercise the power of appointment to office in a specified case, and this by necessary implication forbids the exercise of such power in all other cases.

The creation of an office may be accomplished by law. It is a legislative power. Ordinarily the filling of an office is a power to be exercised by the people, and unless to be thus exercised or in some other mode expressly provided by the Constitution, the duty must be performed by the executive. I am well aware that there are numerous cases upon both sides of this proposition, but the reasoning of the authorities appears to me to be entirely against the proposition that the Legislature can create an office, and by the same act name the person who is to fill it—a proposition distinctly decided in the affirmative in the opinion of the majority—or can fill such an office by any subsequent act or vote. With the policy of the law I have nothing to do. The evils which must necessarily follow such so-called "legislation" may be alluded to as probably operating upon the minds of the

framers of the organic law when they inserted the provision under consideration. One Legislature enacts a law or two creating offices, and appoints the incumbents to those offices. Such legislation being upheld by the courts, the next Legislature will go further, for it is not of record that any Legislature has voluntarily relinquished powers of this character. The result will inevitably be that in time the brief period permitted by the Constitution for legislative session will be entirely occupied in devising and creation of new offices, and in shameless trafficking in votes to secure appointments to office. It is instructive to consider in this connection the fact that under the Federal Constitution, which contained no direct inhibition against the exercise of the powers of one department by persons connected with another, such as is contained in our Constitution, the Federal Congress has never passed an act creating an office, and at the same time filled the office, and has never attempted it but once. I attach little importance to the fact that the librarian has for many years, without protest, been elected by the Legislature; for the powers and duties of the librarian may, without any great stretch of judicial interpretation, be construed to make that officer an officer of the General Assembly. Nor does it seem to me that the fact that the Legislature at one time elected a warden of the penitentiary should be held decisive of this case, when the constitutionality of that legislation was never called in question before the courts.

These, stated briefly, and without elaboration or argument, are my reasons for dissenting from the opinion of the majority. I regard this legislation as the first flagrant act in the destruction of the barrier against con-

fusion of powers of government which was provided by the wisdom of Mr. Jefferson for the firstborn daughter of Virginia.

Judge Burnam concurs in this dissent.

---

CASE 34—ACTION TO VACATE JUDGMENT—JUNE 23.