# Cincinnati, New Orleans & Texas Pacific Railway Company v. Cundiff.

## (Decided November 9, 1915.)

### Appeal from Boyle Circuit Court.

1.  Officers—Railroad Policeman.—One appointed by the Governor at the instance of a railroad to act as railroad policeman, under Section 779a Kentucky Statutes, and fails to qualify as such by executing bond and taking the oath of office within 30 days after receiving notice of his appointment, vacates his office under the provisions of Section 236 of the Constitution and Section 3755, Kentucky Statutes.

2.  Officers—Railroad Policeman.—Where one is appointed railroad policeman and does not qualify for more than a year from the date of his appointment, held, the lapse of time unexplained amounts to such an unreasonable delay as to raise the presumption that he failed to qualify in 30 days from the receipt of notice of his appointment.

3.  Officers—Railroad Policeman.—It was incumbent upon the police officer so appointed, and upon the railroad at whose instance he was appointed, to see and know that he qualified within the statutory period before employing him to act as policeman, and before permitting him to act as such.

4.  Officers—Action for Wrongful Arrest.—Until he qualified in the manner and time provided he was neither an officer de jure nor de facto, and the mere fact that he was commissioned by the Governor will not serve as defense for him or the railroad who had him appointed, in an action against them to recover for an arrest wrongfully made by him.

5.  Officers—Railroad Policeman.—Kentucky Statutes, Section 779a, creating the office of railroad policeman is not violative of Sections 93 and 107 of the Constitution in failing to limit the term of office for a time not exceeding four years, but the term of office is limited to four years.

6.  Officers—Arrest.—Where one in making an arrest, and deputizing another to aid him assumes to act by special appointment, and never qualified to act as such, he is not a known public officer, and both are liable as trespassers.

7.  Officers—Private Citizen Summoned to Make Arrest.—A private citizen may respond to the summons of a known public officer without inquiry if an offense has been committed, and without investigation as to regularity of process under which the officer acts and in such case the deputy is relieved of liability, although his chief may act wrongfully.

8.  Damages—Punitive Damages—Instructions.—Where the arrest and eviction from the train was without malice, and not wantonly or recklessly done, and there was no evidence of unnecessary force

or oppression, it was error to give an instruction authorizing a finding of punitive damages.

9.  Damages—Verdict Not Excessive.—For the same reason, held that a verdict for $4,000 damages was excessive.

NELSON D. RODES, CHARLES H. RODES and JOHN GALVIN for appellant.

ROBERT HARDING, CHARLES MONTGOMERY, EMMET PURYEAR and JOHN W. RAWLINGS for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

This is an appeal from a judgment rendered against the appellant railway company, Samuel Morrow, and C. N. Mitchell, in favor of appellee for the sum of $4,000. The petition charges that the railway company and its servants, the co-defendants, wrongfully, maliciously and forcibly ejected him from its train, and caused him to be taken by other railroad servants to a police station at Ludlow and there locked up. The defendants filed separate answers, in which they alleged that Mitchell and Morrow were officers of the Commonwealth and not servants or employes of the railroad. Mitchell and Morrow admitted that they took the appellee, Cundiff, off of the train and delivered him to other police officers at Ludlow, Kentucky, but they say that, acting as police officers of the Commonwealth, they arrested him because he was drunk, using profane language and behaving in a disorderly manner on the train. They claim to have acted in good faith and upon probable cause, and without malice toward appellee. In brief, the facts are as follows:

Appellee was the County Court Clerk of Casey county and a candidate for re-election. In the latter part of August, 1913, a considerable number of men from Casey and surrounding counties went to Cincinnati on a Sunday excursion. Appellee lived at Liberty, the county seat, which was 17 miles from Moreland, the nearest station on appellant's road. In company with many others, they left Liberty on Saturday night about 11 o'clock, and drove overland in order to reach Moreland at 5 o'clock Sunday morning, when the excursion train was due. There was jamaica ginger in the party before they left Liberty, and it is inferable from the record that on the road to Moreland, and on the train to Cincinnati, members of the party were drinking intoxicants of some

kind, although there is no evidence that Cundiff partook until he reached Cincinnati. Just why he went to Cincinnati on a Sunday excursion is not a necessary, if a fair, inquiry. He attempts to excuse the trip, however, by stating that his brother-in-law lived there, and, also, calls attention to the fact that a good many voters from his county were going and he wanted to "electioneer" with them. He admits taking several drinks of beer in Cincinnati, but does not fix the number. His friends count at least six that he drank. How many of these are in addition to those admitted by Cundiff the record leaves in doubt. He maintains, however, that he was not drunk, and his friends, certainly not less drunk, corroborate him. According to his story, he was worn out by the time the train was ready to leave Cincinnati that evening at 6 o'clock, and quite naturally his party were at the station a long while, perhaps an hour, before starting time. Before the train gates were opened they made one or more trips to a nearby saloon, where appellee admits taking a final glass of beer, and Waldon, his closest companion, bought a flask of brandy. When the gates were opened they got aboard the train. It consisted of 14 cars. Appellee and his companions got on the second car from the rear end. It was August, the shed was close, the crowd was large, and the train was next to a stone wall, where the sun had been shining all day. Of course, it was oppressive in the car, and, from these circumstances, it is easy to understand how, in connection with being up all night and going all day in a pair of new shoes, appellee felt the need of rest. He says as much, and immediately they were seated, he put up his hat, pulled off his coat, removed his collar, unbuttoned his shirt, and took off his shoes. In order that he might not be disturbed, he gave his ticket to Waldon, his companion, with request that he hand it to the conductor. Thus relieved, and so clad, he went to sleep. He never knew when the train started. In fact, the first thing he says that he did know was when, in the fifth car from the engine, Morrow caught him by the collar and jerked him out of the seat, and, with the help of Mitchell, marched him to the baggage car, where there were four other drunken passengers. Cundiff says he asked Morrow, "What is the matter? What have I done? What are you doing?" Morrow replied, "I am an officer." Cundiff says, "I am clerk of the

county court." To which Morrow replied, "Go on there, I will take care of you." When the train reached Ludlow, Cundiff and the other men in the baggage car were taken off. Cundiff says he then appealed to Morrow for release on the ground of politics and former association with some of Morrow's relatives; but Morrow was obdurate. Cundiff then discovered that he was without coat, collar, hat, or shoes, and asked for time to go aboard to get them. The train was held while Morrow went back for them, but he was only able to find the coat and hat. Cundiff and the baggage car outfit were delivered into the hands of an alleged police officer at Ludlow, while the other men from Casey continued their journey homeward. With Cundiff in his stocking feet, they were marched some 800 yards to the police station. Cundiff says the other men were put in a cell, but they left him out in the corridor and locked him up. As to being locked up anywhere no witness supports him, and appellant's witnesses deny it. The mayor came down in a short time and looked him over, and said, "I find no fault in this man." According to precedent, ancient, if not honorable, he desired to wash his hands of the affair by directing his release. To this Cundiff demurred and insisted that a charge be preferred and a day fixed for trial, and that he be admitted to bail. After some argument, a day was set and Cundiff prepared an appearance bond in his own hand, which a sympathizing by-stander signed. On the day fixed for trial Cundiff appeared; the case was heard; attorney for the railroad took a part, and Cundiff was acquitted.

Three of Cundiff's companions claim to know when Morrow arrested him, but none of them followed to see what became of him. With Cundiff they occupied seats near the end of the car, facing each other. These men testified that Cundiff went to sleep and never moved from his place until he was pulled out of it by Morrow. They insist that he was not drunk or offensive or creating any sort of disturbance. Waldon, his closest associate, was removed to the baggage car soon after Cundiff was taken off, and he is frank enough to say : "You see, the fact of the business is, when they taken Mr. Cundiff, you know, you see I had lost sleep all night, had been up, and was wore out and sleepy, and I just simply laid down and went to sleep. Some of the gentlemen just taken me over in the baggage car and I slept in

there, and then I went back to my car." He explains that all his brandy was gone when he returned.

Morrow testified that he first saw Cundiff and Waldon together that evening as they came through the station gate "walking and staggering along down the train." They got aboard the 12th car, that is the second from the rear. Morrow was acting as a police officer (whether rightfully so is another question). The whole length of the train was his beat. He next saw Cundiff out in the aisle near the middle of the car. A man was trying to get by him. Cundiff was making secret order signs, and not receiving a proper response remarked that any man that did not belong to his secret order "is a ―― ―――― fool." Morrow caught him by the shoulder and told him he was an officer and cautioned him of the presence of ladies and asked him to take his seat and get out of the way. Cundiff wanted to talk to him about his secret order, and upon receiving information that Morrow did not belong, expressed the opinion, "well, ―― ――, you have lost the best years of your life." Morrow shoved him down in the seat and went on to the rear of the train. Coming back in three or four minutes he found him two cars ahead, where he was falling over, and making signs to, an old gentleman. He was advising the old man, with some profanity, to "join as soon as possible." Morrow warned him that if he did not sit down and keep quiet he would have to arrest him. Morrow went on to the front of the train, and then made another round trip without encountering Cundiff. On his next trip, he found Cundiff in the fifth car from the engine, seated, and cursing because he could not find a member of his secret order on the train. Morrow then arrested him and deputized Mitchell, a railroad employe, to take him to the baggage car. Morrow thus described his appearance:

"He didn't have any coat, and his shirt was open; his person was exposed; he did not look like he had combed his head for some time; his hair was stringing around his face; the smell of beer was strong on his breath, * * * and his shirt-tail was out."

Mitchell, the old man, and other passengers corroborate Morrow in many of these details, and it is established beyond controversy, that the arrest occurred in the fifth car from the engine.

Reversal is asked on several grounds. (1) Morrow acted as a police officer of the Commonwealth and Mitchell was his deputy, and the court erred in rejecting evidence tending to show Morrow's power so to act and deputize Mitchell. (2) The court erred in giving an instruction authorizing the recovery of punitive damages. (3) The verdict is excessive.

Appellants offered to prove that Morrow was a railroad policeman, appointed and commissioned by the Governor of Kentucky in June, 1906, and that on July 3, 1907, he qualified to act as such by taking the oath of office and executing bond to the Commonwealth under the provisions of Section 779a, Kentucky Statutes. The court ruled that the evidence offered was incompetent. The point was saved by avowal to the above effect. The statute referred to provides that railroad corporations may apply to the Governor and have certain designated persons appointed and commissioned to act as policemen, with powers of sheriffs or constables upon trains and about depots. Any person so appointed shall qualify in the county of his residence by executing bond with good security and taking and subscribing to the oath of office required by the Constitution. These facts must be endorsed upon his commission. Certified copy of the commission, together with the endorsements thereon, shall be recorded in the county court clerk's office of every county in which it is intended the policeman shall act. The policeman is subject to all the liabilities of sheriffs and constables, and for which the surety on the bond is responsible. The compensation of such policeman is paid by the railroad at whose instance he was appointed and is fixed by agreement between them. When the railroad deems that his services are no longer required, it may file notice to that effect in the several counties where his commission is recorded, and thereupon his right to act as policeman shall cease.

There is nothing in the case to show that the conductor or other employes of the railroad caused Morrow to arrest or eject Cundiff from the train. He acted upon his own initiative. Whether he was a servant of the railroad to the extent that the railroad would be answerable for his conduct, if, in fact, he had been lawfully commissioned and qualified to act as railroad policeman, is a question not presented by this record. We have reached the conclusion that he was not authorized to

make the arrest by virtue of the commission issued to him by the Governor. (1) He failed to qualify within the time required by law. (2) His term of office had expired when he made the arrest. His commission was issued on June 22, 1906. Pulaski was the county of his residence, and he there took the oath of office and executed bond on July 3, 1907. Certified copies of the commission and qualification were subsequently recorded in Kenton county, where the arrest was made. Section 236 of the Constitution provides that the General Assembly shall by law "prescribe a time when the several officers authorized or directed by this Constitution to be elected, or appointed, shall enter upon the duties of their respective offices, except where the time is fixed by this Constitution." In compliance with this constitutional requirement, Section 3755 of the Kentucky Statutes was enacted, and is as follows:

"If the official bond is not given and the oath of office taken on or before the day on which the term of office to which a person has been elected begins, or in case of persons appointed to office in 30 days after such person has received notice of his appointment, the office shall be considered vacant and he shall not be eligible thereto for two years."

The avowal does not show when Morrow received notice of his appointment. In view of the lapse of more than a year between the date of his commission and the time of his qualification, we think the date of notice should have been avowed in order to render the evidence competent. This lapse of time, unexplained, amounted to such an unreasonable delay as to raise the presumption that he did not execute the bond and take the oath of office within 30 days after he received notice of his appointment. Therefore, we must hold that the office was made vacant, and he rendered himself ineligible thereto for two years.

The arrest was made in August, 1913, more than seven years after his appointment, and more than six years after his attempted qualification. Under the Constitution, his term of office was four years. It follows, therefore, that it had expired when the arrest was made, assuming that he ever was legally qualified to make the arrest. Legislative authority to create this office comes from Sections 93 and 107 of the Constitution, which are as follows:

"Sec. 93. . Inferior and State officers, not specifically provided for in this Constitution, may be appointed or elected in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified."

"Sec. 107. The General Assembly may provide for the election or appointment, for a term not longer than four years, of such other county or district ministerial and executive officers, as may from time to time be necessary."

It will be noticed that Section 779a is silent as to the length of time that a railroad policeman shall hold his office, except the fact that it may be terminated at the pleasure of the railroad at whose instance the appointment was made. But the failure of the Legislature to fix a term not longer than four years does not of itself render the act unconstitutional.

"In construing statutes the court will never adopt a construction that makes them invalid or unconstitutional, if any other is susceptible from their words." Standard Oil Co. v. Commonwealth, 119 Ky., 75, 26 Ky. L. R., 985; Bender v. City of Louisville, 142 Ky., 409, 134 S. W., 458; Commonwealth v. Hodges, 136 Ky., 233, 125 S. W., 689; Commonwealth v. International Harvester Co., 131 Ky., 551, 115 S. W., 703.

Agreeable to this rule of construction, and as applied in the case of Sinking Fund Commissioners v. George, 104 Ky., 260, 47 S. W., 779, we hold that the Legislature intended to create an office for the term permitted by the Constitution, that is, four years, and no more. In that case, the court had under consideration an act of the Legislature creating a board of penitentiary commissioners. The board consisted of three members holding office, one for a term of two years, one for four, and the other for six years. George was elected for the six year term. The constitutionality of the act was attacked on the ground that an office had been created for a term longer than four years. The court held the act constitutional, but limited George's term of office to four years. We quote from the opinion:

"As the General Assembly expressed a willingness that one of the commissioners should hold for two years longer than the Constitution permits, it is certainly reasonable to conclude that it was the will of that body that the commissioner should hold for four years, as this

term is necessarily included in the longer one which it fixed. To hold the act void in so far as it makes the term six years instead of four, still the balance of the act is complete and enforcible. * * * The General Assembly has not only shown a willingness that the terms shall be as much as four years, but that they shall be six. If the unconstitutional portions of an act can be stricken out, and that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected, it must be sustained. When that part of the act which adds two years to the constitutional term of four years is rejected, there will be three commissioners, one of whom shall hold for a term of two years, and two for a term of four years each, and, in the language of the act, holds 'until their successors are elected and qualified.'"

. Arguing that Morrow was lawfully qualified in the first place, appellant contends that under Section 93 of the Constitution he was lawfully acting as policeman, although the four year term had expired, because, as it says, no successor had been appointed or qualified to take his place. We do not consider this reasoning sound for two reasons: First, the avowal is lacking in that regard. And, in the next place, the statute shows that no such thing as succession in this office was contemplated. When the term of office of a railroad policeman expires, whether by operation of law or at the will of the railroad, the office he held ceases with the officer. When another is appointed he does not take it as successor to anyone.

Neither can it be said that Morrow was a *de facto* officer. Nor did the railroad, responsible for his appointment, have the right to so regard him. It was incumbent upon the railroad to see or know that he had qualified to act as an officer *de jure* before he be given employment on its trains.

"When an officer is called upon to justify an illegal arrest and he relies upon his official capacity, it is usually considered necessary that he should prove not only that he was an acting officer, but that he was an officer in truth and right, duly commissioned and qualified to act as such." Vol. 2, R. C. L., 490.

Morrow not being a public officer, his summons to Mitchell to aid in keeping Cundiff in custody does not relieve Mitchell of responsibility.

"Every citizen is bound to assist a *known* public officer in making an arrest, when called upon to do so. * * * According to the better considered authorities private persons may respond to the call of a *known* officer without waiting for information as to the offense which the criminal has committed and without pausing to inquire into the regularity of the process; and whoever in good faith renders assistance and obeys the orders and directions of a *known* public officer in response to a call for assistance is protected in making the arrest, although the officer may be acting wrongfully and may be personally liable for the false arrest." 2 R. C. L., 491.

But where the party making the arrest is not a known officer, but only assumes to act in that particular case by special appointment, persons aiding the supposed officer are bound to know whether he has authority to make the arrest or not, and in case he is a trespasser for want of authority, those aiding him are also liable. Dietrichs v. Shaw, 43 Ind., 177. See, also, note, Tyron v. Pingree (Mich.), 67 Am. St. Rep., 421:

Section 3755, Kentucky Statutes, *supra,* prescribing the time in which an officer shall qualify, in express terms vacates the office for failure to comply therewith. The railroad is not in the position of a third party who may claim that the acts of a *de facto* officer are valid as to it. The railroad is responsible for his claim of such right, and whatever steps he takes under such claim of right are taken at their peril.

The instructions authorized the jury to find for Cundiff such damages as would reasonably and fairly compensate him for the mortification and humiliation he experienced in being arrested and evicted from the train, if it was done wrongfully and without probable cause. In their discretion they were also authorized to award punitive damages, if they believed the defendants acted maliciously and with a reckless and wanton indifference to Cundiff's rights as a passenger on the train.

Appellant's counsel, at the trial, asked Morrow if, at the time he arrested Cundiff, he believed in good faith that he had a right to make the arrest. The court sus-

tained an objection to this question, and appellant excepted and avowed:

"That the witness, if permitted to answer, would state that he believed in good faith and honestly that he was entitled to do that for the protection of the women and children and other passengers on board the train against drunken and disorderly persons."

We think this evidence would have been competent had Cundiff made out a case warranting an instruction on punitive damages. Where at best the evidence justifies recovery of compensatory damages only, this evidence as to motive is not proper. However, we feel that it was error to give an instruction on punitive damages. The elements of unnecessary force and oppression are wanting. There was nothing in the conduct of Morrow and Mitchell that can be considered as a wanton or reckless disregard of Cundiff's rights as a passenger. Neither was their manner or language insulting. On another trial the court will omit the instruction on punitive damages. L. & N. v. Scott, 141 Ky., 530, 34 L. R. A. (N. S.), 206; L. & N. v. Ballard, 88 Ky., 159; Memphis v. Nagel, 97 Ky., 9; Southern Ry. v. Hawkins, 121 Ky., 415; 13 Cyc., 109. See cases cited Hobson on Iustructions, Sec. 176.

We are also of opinion that the damages allowed are excessive, even if it be conceded that Cundiff was not drunk or disorderly, and that his arrest and eviction were wrongful. Proof of these facts would only entitle him to compensatory damages for the humiliation. Nothing is shown in the way of excessive force or brutal treatment. He was detained at the police station for only an hour. No physical injury was inflicted. We are of opinion that the damages awarded are in excess of what would justly compensate him for the suffering endured.

In the case of Schneider v. McGill, 23 Ky. Law Rep., 587, one McGill, the clerk at a primary election, was arrested by a police officer for breach of the peace that had not been committed. McGill was imprisoned for about three hours. In a civil action against the policeman for false arrest and imprisonment the jury awarded McGill four thousand dollars. In holding that such a verdict was clearly excessive this court said:

"We are also of opinion that the amount of the verdict is excessive, so much so as of itself to authorize a

reversal. The proof shows that appellee was charged with an ordinary misdemeanor when arrested, and was kept in custody only about three hours, and suffered no unusual indignity and no violence. We have found no case where a judgment for $4,000 for false imprisonment for only a few hours has been sustained; on the contrary, we find many cases where verdicts for less amounts have been held excessive."

The cases referred to below involve questions somewhat similar to this, and verdicts in smaller sums than in the case at bar were held to be excessive: In C., N. O. & T. P. Ry. Co. v. Carson, 145 Ky., 81, 140 S. W., 71, four hundred dollars; in Southern Ry. v. Hawkins, 121 Ky., 415, 89 S. W., 258, 28 R., 364, one thousand dollars; in L. & N. v. Breckinridge, 99 Ky., 1, five hundred dollars; in L. & E. Ry. v. Lyons, 104 Ky., 23, 46 S. W., 209, 20 R., 516, two hundred and sixty dollars; in L. & N. v. Fish, 127 S. W., 519, five hundred dollars; and in Camden Interstate, &c., v. Frazier, 97 S. W., 776, 30 R., 186, five hundred dollars.

Judgment reversed. Whole court sitting.