CASE 58.—PROSECUTION BY COMMONWEALTH AGAINST
    THE INTERNATIONAL HARVESTER CO. OF
    AMERICA FOR VIOLATING THE ANTI-TRUST
    STATUTE OF JULY 2, 1890.—January 26.

# Commonwealth v. International Harvester Co

Appeal from Hardin Circuit Court.   ·

Weed S. Chelf, Circuit Judge.

From a judgment sustaining a demurrer to the
indictment the Commonwealth appeals—Affirmed.

1. Constitutional Law—Class Legislation.—A statute which,
   when construed according to the canons of statutory con-
   struction, confers the right on one class of citizens to do an
   act made a criminal offense when done by any other class,
   conflicts with the fourteenth amendment to the federal Con-
   stitution.

2. Same—Statutes—Validity.—The federal Constitution is the
   supreme law of the land, and a state statute in conflict with
   it is void, and state statutes going within the domain of the
   powers of government over which the federal Constitution
   extends must be construed with reference to it.

3. Courts—Federal Courts—State Courts—"Laws of the State."—
   The laws of a state are such enactments as its Legislature
   promulgates, and as expounded by its courts, and a state
   statute has such meaning as the judicial department of the
   state construes it to have, though without such judicial con-
   struction the federal courts might from its language construe
   it differently.

4. Statutes—Construction—Legislative Intent.—The court in con-
   struing a statute must aim to arrive at the legislative mean-
   ing, which is done by resorting to the language of the
   statute itself, and to that language alone, together with the
   legislative purpose, where the language used is unambiguous.

5. Same—Construction—Legislative Intent.—Where the Legis-
   lature has enacted two or more statutes, which from their
   wording appear to be inconsistent, or in conflict with the

state or federal Constitutions, there is an ambiguity, and the courts construing the statutes are permitted to look beyond their words as to the legislative purpose.

6. Constitutional Law—Statutes—Validity—Presumptions.—It is always presumed that a Legislature, in adopting a statute, did not intend thereby to violate either the federal or state Constitutions.

7. Statutes—Repeal—Repeal by Implication—Presumptions.—Repeals by implication are not favored, and it is presumed that, where the Legislature intended that one statute should repeal another, it would so express itself as to leave no doubt of its purpose:

8. Same—Construction—Inconsistent Statutes.—Where two statutes on the same subject appear to be inconsistent with each other, the court must construe them so as to harmonize them if possible, and thus allow both to stand, and, where that cannot be done, the court must construe them so that both will stand as far as possible, and, where any part of either is irreconcilable with any part of the other, the later statute stands.

9. Monopolies—Constitutional Provisions—Construction.—Const. section 198, requiring the General Assembly to enact laws to prevent all trusts, pools, etc., created to depreciate below its real value any article, or to enhance the cost of any article above its real value, leaves it to the General Assembly to determine the need of future legislation on the subject, and only forbids trusts and pools created to depreciate an article below its real value or to enhance its cost above its real value, and does not repeal Act May 20, 1890, prohibiting trusts, pools, etc., to control the price of merchandise, etc.

10. Constitutional Law—Legislative Power—Limitations.—State Constitutions are limitations of power, and while a Legislature may enact any statute not prohibited by the Constitution, yet it is bound by its limitations.

11. Monopolies—Statutes—Construction.—Acts 1906, p. 429, c. 117, legalizing pooling of farm products for the purpose of classifying, grading, and selling, in order that a higher price may be obtained, enables farmers to combine their resources and place their property in the hands of some agent selected by them, to the end that better prices may be obtained, provided their purpose is not to enhance the price of their products above the real value; and it is not invalid under Const. section 198, requiring the General Assembly to enact laws to prevent trusts, pools, etc., created to depreciate

Commonwealth v. International Harvester Co.

below its real value any article, or to enhance the cost of any article above its real value.

12.   Same.—Acts 1906, p. 429, c. 117, legalizing the pooling of farm products, if construed to authorize farmers to pool their products in order to enable them to obtain more for them than their real value, is in conflict with Const. section 198, requiring the General Assembly to enact laws to prevent trusts, pools, etc., to enhance the cost of any article above its real value; but the act is not wholly a nullity, but is valid so far as it permits farmers to combine to obtain better prices, provided such prices are not above the real value.

13.   Statutes—Construction—Statutes in Pari Materia.—Two statutes enacted at different sessions of the Legislature, on the same subject, must be treated in pari materia, and the court must presume that the Legislature intended all the enactments to constitute a consistent treatment of the subject within constitutional limitations.

14.   Same.—Where two or more statutes on the same subject are enacted at different sessions of the Legislature, the statutes must be read in conjunction with the state and federal Constitutions and the several enactments will be treated as a harmonious consistent system, in preference to supposing that, literally construed, one is repugnant to the others, and some enactments in consequence wholly fail.

15.   Same.—The construction of a statute which will sustain its validity must be adopted, if possible, under the language employed.

16.   Monopolies—Statutes—Construction.—Act May 20, 1890 (Ky. Stat. 1903, section 3915) prohibiting trusts, pools, etc., to regulate the price of any article or to limit the amount of any article, and Acts 1906, p. 429, c. 117, legalizing the pooling of farm products, when construed in connection with Const. section 198, requiring the General Assembly to enact laws to prevent trusts, pools, etc., created to depreciate any article below its real value or to enhance the cost of any article above its real value, and, in connection with the fourteenth amendment to the federal Constitution, permit persons to pool their property or combine their capital and other resources, provided any article is not thereby depreciated below its real value, or its cost thereby enhanced above its real value.

17.   Constitutional Law—Class Legislation.—The fourteenth amendment to the federal Constitution does not prohibit a state from enacting any measure favorable to any class of persons within its jurisdiction, but it acts automatically on

the laws of the state, and raises persons excluded from a favored class to the same level as that enjoyed by such class, thereby securing to all the same benefits.

18. Same—Equal Protection of the Laws.—Act May 20, 1890 (Ky. Stats. 1903, section 3915), prohibits trusts, pools, etc., to fix the price of any article or to limit the amount of any article. Acts 1906, p. 429, c. 117, legalizes the pooling of farm products for the purpose of classifying, grading, and selling the same, in order that a higher price may be obtained therefor. Held that, if the Legislature in enacting the statute of 1906 proposed to give farmers alone the right to pool their products, the fourteenth amendment to the federal Constitution operated to give other persons the same right, and to that extent the act of 1906 amends the act of 1890.

19 Monopolies—Statutes—Construction—"Real Value."—Act May 20, 1890 (Ky. Stats. 1903, section 3915), prohibiting trusts to regulate the price of any article or to limit the amount of any article, and Acts 1906, p. 429, c. 117, legalizing the pooling of farm products, when construed in connection with Const. section 198, requiring the Legislature to pass laws to prevent trusts, pools, etc., to depreciate any article below its real value or to enhance its cost above its real value, are not invalid because uncertain, for the standard fixed is real value, which is market value, at a sale under normal conditions, unaffected by any combination of producers or dealers whose object is to create an abnormal condition in the market, and is susceptible of proof by proof of preexisting facts.

20. Same—Offenses.—Act May 20, 1890 (Ky. Stats. 1903, section 3915), and Acts 1906, p. 429, c. 117, prohibiting trusts, pools, etc., to fix the price of any article or to limit the amount of any article, and legalizing the pooling of farm products, extend the principles of the common law, making it an offense to absorb by fraud or coercion any of the necessities of life, to all articles of commerce, and, while the common law made the crime depend on the use of fraud and coercion, the statutes leave out such ingredients; and while, at common law, the result must have produced misery on the mass of the people, the statutes declare that it is enough if the result unsettles the usual balance of the market in the commodity; and while, at common law, the final test was whether the result brought the prices of the commodities greatly above their real value, the test under the statutes is whether the price is enhanced above or below the real value.

21. Same—Indictment.—An indictment charging a violation of

Commonwealth v. International Harvester Co.

Act May 20, 1890 (Ky. Stats. 1903, section 3915), prohibiting pools, trusts, etc., to fix the price of any article or to limit the amount of any article, must allege that the purpose or effect of the alleged combination or pool was to enhance the articles named above their real value, or to depreciate the price below its real value.

N. B. HAYS, Attorney General, J. R. Layman, Commonwealth's Attorney, and C. H. MORRIS for appellant.

### INDICTMENT.

1. The indictment in this case is in the language of the act of 1890. If the indictment for a statutory offense is couched in the language of the statute, it is sufficient on demurrer. (Comth. v. Grinstead, 21 Ky. Law Rep. 1444; Comth. v. Barvarian Brewing Co., 23 Ky. Law Rep. 2334; International Harvester Co. of America v. Comth., 30 Ky. Law Rep.; Davis v. Comth., 13 Bush 318; Ward v. Comth., 13 Bush 233; Buchannon v. Comth., 95 Ky. 334; Criminal Code, section 136.)

2. A person not prejudiced, or one who does not belong to the class that might be injured by a statute, cannot raise the question of its invalidity or its validity; nor can he have the court to pass upon the constitutionality or unconstitutionality of the statute; nor can he have the court to pass upon the effect which such statute may have upon another statute independent and a separate act of the legislature. (Red River Valley National Bank v. Craik, 181 U. S. 550 (45:1000); Comth. v. Wright, 79 Ky. 22; Sullivan v. Berry's Admr., 83 Ky. 198; Burnside v. Lincoln County Court, 86 Ky. 423.)

L. A. FAUREST, HUMPHREY & HUMPHREY and ARTHUR M. RUTLEDGE for appellee.

### QUESTIONS DISCUSSED AND AUTHORITIES CITED.

1. The Act of May 20, 1890, when taken in connection with the Act of March 21, 1906, denies to appellee, and all other producers of, and dealers in, commodities other than farm products, the equal protection of the laws, and is in violation of the Fourteenth Amendment tot he Constitution of the United States. (Fourteenth Amendment to the Constitution of the United States; Connolly v. Union Sewer Pipe Co. 184 U. S. 540; Brown v. Jacobs Pharmacy Co., 115 Ga. 429, 57 L. R. A. 559; State v. Compress Co., 95 Tex. 611; Re Grice, 79 Fed. Rep. 627; Matthews v. People,

202 Ill. 403; Niagara Fire Ins. Co. v. Cornell, 110 Fed. Rep. 827; Union County National Bank v. Czark Lumber Co., 127 Fed. Rep. 206.)

2. The Act of 1890, and not the Act of 1906, contravenes the Fourteenth Amendment, because:

(a) That amendment does not restrict the right of the favored class, but guarantees equal rights to those who have .been discriminated against.    (Strauder v. West Virginia, 100 U. S. 303.)

(b) The plain legislative intent is that the growers of farm products shall not be subject to a penalty for entering into any combination to procure higher prices for their products.    (Connolly v. Union Sewer Pipe Co., supra.)

3. The indictment does not show whether the acts charged were committed before or after March 21, 1906. It must, therefore, be assumed that they were committed after that date. (Comth. v. T. J. Megibben Co., 101 Ky. 195; Comth v. Aultmire, 22 Ky. Law Rep. 511; Criminal Code section 129.)

OPINION OF THE COURT BY JUDGE O'REAR—Affirming.

Appellee was indicted on June 9, 1909, under the Kentucky anti-trust statute, the indictment reading:

"The grand jurors of the county of Hardin, in the name and by the authority of the Commonwealth of Kentucky, accuse the International Harvester Company of America, a corporation, of the offense of unlawfully and willfully creating, establishing, organizing, entering into and becoming and being a member and party to and interested in a pool, trust, combine and agreement, and understanding with a number of machine companies, which are independent companies from it for the purpose of controlling and fixing prices of certain articles of farming machinery and repairs, and fixing and controlling the output and number manufactured, committed in manner and form as follows, to-wit: The said International Harvester Company of America, a corporation, in said county of Hardin on the ——— day of ——————,

1906, and before the finding of this indictment being a corporation created under and by the laws of one of the states of the United States of America other than Kentucky, organized for the purpose and engaged in doing business in Kentucky and other states of said United States, did unlawfully create, establish, organize, enter into, become a member of a party to and interested in a pool, trust, combine, agreement, confederation and understanding with the McCormick Machine Company, the Champion Machine Company, the Piano Machine Company, Deering Harvester Company, some of which are corporations and some of which are joint-stock companies but this jury cannot say which are corporations and which are not, nor can they say who constitute the members of any joint-stock company named or in what state those companies being corporations, are incorporated, and various other companies and incorporations to this grand jury unknown, for the purpose of controlling and fixing the prices, and limiting the quantity of mowers, reapers, binders, rakes and repairs for same, and various other articles unknown to this grand jury, and binder twine, and said understanding, agreement, arrangement and combine now exists and has existed for some time, and said International Harvester Company of America handles and disposes of such articles in said county. This grand jury does not know and cannot say what state said company is incorporated in. All business done in said county by all of said companies is done pursuant to said agreement and understanding by said parties against the peace and dignity of the Commonwealth of Kentucky.''

The statute under which the indictment was returned is section 3915, Ky. St. (Ed. 1903) and is the

act adopted and approved May 20, 1890. It is as follows: ''That if any corporation under the laws of Kentucky, or under the laws of any other state or county, for transacting or conducting any kind of business in this State, or any partnership, company, firm or individual, or other association of persons, shall create, establish, organize or enter into, or become a member of, or a party to, or in any way interested in any pool, trust, combine, agreement, confederation or understanding with any other corporation, partnership, individual or person, or association of persons, for the purpose of regulating or controlling or fixing the price of any merchandise, manufactured articles or property of any kind, or shall enter into, become a member of, or party to or in any way interested in any pool, agreement, contract, understanding, combination or confederation, having for its object the fixing, or in any way limiting the amount or quantity of any article of property, commodity or merchandise to be produced or manufactured, mined, bought or sold, shall be deemed guilty of the crime of conspiracy, and punished therefor as provided in the subsequent sections of this act.''

An act of the General Assembly was passed and approved March 21, 1906, being chapter 117, p. 429, of the Acts of 1906, the first section of which reads: ''It is hereby declared lawful for any number of persons to combine, unite or pool, any or all of the crops of wheat, tobacco, corn, oats, hay, or other farm products raised by them, for the purpose of classifying, grading, storing, holding, selling or disposing of same, either in parcels or as a whole, in order or for the purpose of obtaining a greater or higher price therefor than they might or could obtain or receive by selling said crops separately or individually.''

The other sections of the latter act, as well as the act of May 20, 1890, have to do with the procedure under the acts, and affect only certain features of the main provisions which are set forth in the sections quoted above.

Appellee demurred to the indictment, on the ground that, as it failed to show when the offense charged had been committed, it must be presumed that it was at any period covered by the indictment most unfavorable to the prosecution, which would be subsequent to March 21, 1906, and prior to the time the indictment was returned. Commonwealth v. T. J. Megibben Co., 101 Ky. 195, 40 S. W. 694, 19 Ky. Law Rep. 291. It was therefore contended by appellee that inasmuch as the act of 1890 made the transaction with which it was charged illegal, and as the act of March 21, 1906, allowed farmers to do the same thing as legal, the defendant was not furnished equal protection under the laws of Kentucky, and that in consequence the act of May 20, 1890, must fail, as the State is forbidden by the fourteenth amendment to the Constitution of the United States from denying equal protection of the laws to all persons within its jurisdiction. The circuit court sustained the demurrer on the ground that discrimination was worked against appellee under the statute, and dismissed the indictment. From that judgment the Commonwealth has prosecuted this appeal for a construction of the law.

We are satisfied the circuit court was not in error in sustaining the demurrer to the indictment, but that it was in error as to the ground upon which it based its ruling. As the construction of these statutes seems to be important to the welfare of the State, we here set down our interpretation of them, as reasons for the conclusion at which we have arrived.

In the first place, there is no denial that if the two statutes in question, when construed according to the cannons of statutory construction, confer the right upon one class of citizens to do an act, which is made a criminal offense if done by any other class, it would controverse the fourteenth amendment to the federal Constitution, which declares: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws." The federal Constitution is the paramount law of the land. A statute of a state in conflict with it is void. State statutes, therefore, when they come within the domain of the powers of government over which the federal Constitution extends, must be read and applied with reference to the provisions of that instrument.

The laws of a state, particularly its statutory laws, are such enactments as its legislative body promulgates, as expounded and applied by its courts. A state statute has such meaning as the judicial department of that state construes it to have. Bank of Hamilton v. Dudley's Lessee, 2 Pet. 492, 7 L. Ed. 496; Elmendorf v. Taylor, 10 Wheat. 152, 6 L. Ed. 289; Railroad v. Georgia, 98 U. S. 359, 25 L. Ed. 185. This is so, even though, without such judicial construction, the federal courts might have, from the language of the statute, construed it differently. Green v. Neal's Lessee, 6 Pet. 291, 8 L. Ed. 402; Bell v. Morrison, 1 Pet. 351, 7 L. Ed. 174; Nesmith v. Sheldon, 7 How. 812, 12 L. Ed. 925. It is primarily for each state to say what police regulation it will adopt. In that matter it speaks through its Legis-

lature. It is for the judiciary of that state to declare the legislative intent and meaning of such enactments, and that declaration is the extent and limit of the particular statutes when they come to be applied either by the judiciary or the executive departments of the State government. Sutherland, Stat. Const. section 5. In construing a statute, the aim is of course to arrive at the legislative meaning. The first, and most important, rule is to resort to the language of the act itself, and that language alone, to gather the legislative purpose, if the language used is unambiguous. It is not allowable, in such state of case, to resort to any other source of information to learn what the lawmaking department intended, or as to what evils they proposed remedying. If, however, the Legislature has enacted two or more statutes which from their wording appear to be inconsistent, or if the statute under consideration appears to be in conflict with a provision of the Constitution. State or federal, there is an ambignity, for it is always presumed that the Legislature did not intend to violate either Constitution; it is always presumed it intended its enactments to become valid and enforceable laws. Nor are repeals by implication favored, as it must be presumed that, if the Legislature had intended that one, statute should repeal another, it would have so expressed it as to leave no doubt .of its purpose. Hence when two statutes bearing on the same subject appear on their face to be so inconsistent with each other, the first duty of the. court called upon to construe them is to harmonize them if possible so as to allow both to stand; or, if that cannot be done without violence to some part of the language employed in one or both the statutes, then the rule is to construe them so that both will stand so

far as possible, and wherein any part of either is irreconcilable with any part of the other the latest stands, while the inconsistent part of the former is deemed to have been repealed. Where an ambiguity exists, whether because of the uncertainty of meaning of the words employed, or because of an apparent conflict in statutes, or between a statute and the Constitution, then and then only, are the courts permitted to look beyond words of the particular statute as to the legislative purpose. Such methods of construction are always for the sole purpose of arriving at the legislative intention.

The last statute is the first to be construed, as it is the latest in date, and as it controls if there is conflict between it and the other statute. Reading it in connection with the act of May 20, 1890, it is perceived the two deal in part with the same subject. When considered literally, they seem to be in conflict. There then exists an ambiguity, an uncertainty as to what the Legislature intended, as the latter does not expressly repeal the former, nor allude to it in terms. Among the aids to which the court may resort in arriving at the legislative purpose in enacting a statute which is ambiguous, is to look to the evil which it was intended to correct. This may be done by resorting to the history of the times, of which the court will take judicial notice. For two decades or more those commercial combinations of capital and resources for reducing competition in their products so as to realize greater and more certain profits from them, by which monopolies more or less complete have been created, have attracted wide public attention. They have been the subject of considerable discussion in the press, and of a great deal of legislation, both State and national. The question has become one of

large importance in political economy.  Such combinations have been so frequent, so numerous, and in many instances so gigantic and successful in their purpose, that it is doubted by many publicists whether they can all be entirely, or ought to be entirely, suppressed by law.  It is believed by many that they have come to stay, in some form, and mark an era of evolution in commercial matters, which it is impolitic, if not impossible, to wholly prevent.  It is not within the province of a court, and certainly not our purpose, to discuss the political features of this subject. But of the existence of these discussions and of the causes leading up to them we must and do take notice.  The principal enactment by the Congress bearing on this subject is popularly known as the "Sherman Anti-Trust law" (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).  All, or nearly all, of the states of the Union have enacted legislation embodying the principal features of the federal act, more or less drastic in their measures.  It is to be noticed that all of them are kindred in purpose, the object being, broadly stated, to prevent monopolistic oppression. Since the first of these statutes, the measures resorted to by the several states have from time to time become complex and more stringent.  From the nature of the subject, Congress alone could deal adequately and lawfully with that feature of it which falls within the term "interstate commerce," while in all other instances the State alone must handle the question. From the general tendency of this legislation, as well as from contemporaneous history, it may be gathered that the efforts of government in dealing with this subject have not been wholly satisfactory, have not been adequate, and that the subject is one about which

much has been learned in the various experiments adopted, and some rejected and replaced by others. It is likely we have not yet seen the perfection of any system for adequately dealing with the question.

That such combinations of the capital and resources of competitors in any business whereby they produce a monopoly with which the public must deal, and by reason of which extortion is practiced upon the public, is admitted everywhere as being highly impolitic, and dangerous in the extreme to the general welfare. Kentucky has taken a part in this general crusade against the evils of the trusts. At a time when much similar legislation was being adopted, and when the subject was comparatively new as a legislative venture, this State enacted the act of May 20, 1890, already quoted in this opinion. The terms of that act seem to us to be as comprehensive as it is possible to have made them. The act included every form of combination, by whomsoever entered into in this State, and whatever kind of property, where the object was to "regulate, control or fix" the price of a commodity, and whether the object was successful or not. Notwithstanding, the evils which it was intended by that act to cure were not materially abated in this State. The statute was upon the books, but the conditions remained the same, or became worse. The effect was that many people of this State were being oppressed, or believed they were being oppressed, by one concern or another operating here in violation of that act.

But to go back a step. Directly after the passage of the act of May 20, 1890, something like a year after its passage, a convention was called by the popular vote to frame a new Constitution for this State. In the debates leading up to the selection of members of

that convention the very evils here discussed were widely canvassed, and from the general scope and spirit of the instrument promulgated by the convention in September of 1891, and ratified by the people, it may be gathered that those evils, and the question of how best and wisely to handle them, engaged the earnest attention of that body. A reference to the debates in the convention (volume 3, pp. 3693-'3706, 3765) discloses that the act of May 20, 1890, and its inefficiency, were fully discussed. Of the many propositions submitted, there was finally adopted the following section, which is now section 198 of the Constitution: "It shall be the duty of the General Assembly from time to time, as necessity may require, to enact such laws as may be necessary to prevent all trusts, pools, combinations or other organizations, from combining to depreciate below its real value any article, or to enhance the cost of any article above its real value." That was a step in the other direction in legislation. It did not evince any purpose to change the public policy of treating monopolistic trusts as evils where they operated oppressively. But it recognized that in dealing with the subject, lest too stringent measures intended to suppress the evil should result injuriously to harmless or even useful combinations, it was expressly provided that the Legislature should, from time to time, as necessity appeared, enact such legislation as would prevent combinations from depreciating commercial property below its real value or enhancing its cost above the real value. Two ideas are prominently advanceed in this section: The main one is, that the real value of articles of commerce should obtain in the markets of that State, so far as affected by combinations; the other is, that it was left to the Legislature to determine

the best method of obtaining that end, recognizing that the stage of legislation upon the subject was yet experimental, and that changes would be necessary from time to time to meet the changing conditions of the country.

It was supposed by some that section 198 of the Constitution repealed the act of May 20, 1890. But not so. This court, in Commonwealth v. Grinstead, 108 Ky. 59, 55 S. W. 720, 57 S. W. 471, 21 Ky. Law Rep. 1444, held that that section of the Constitution and the statute of May 20, 1890, were not inconsistent. On the contrary, it was said in the response to a petition for rehearing, at page 76 of 108 Ky., page 471 of 57 S. W.; "The requirement that the General Assembly shall 'enact such laws as may be necessary to prevent all trusts, pools,' etc., leaves to the Legislature the choice of the legislative machinery to effect the required purpose, and necessarily some discretion as to how much machinery will be required to be effective. Both the means to be employed and the extent to which they are to be employed are committed to the discretion of the Legislature; and if, in order to prevent combinations to depreciate or enhance an article below or above its real value, it is necessary to enact laws to prevent all combinations to fix prices, that is a detail of the necessary legislation required." It was further said that the Legislature had refrained from other legislation for the accomplishment of the requirement of the Constitution upon the assumption that the previous act left in force was best calculated to effectuate that purpose.

The evils intended to be suppressed by the Constitution and the statute of 1890 were unabated. Conditions had grown up where the agricultural class in particular were being made the victims of such com-

binations. The method was, those who bought many
of their products formed pools or trusts, so that there
was left but a single buyer in effect; while those who
sold them many articles needful in the pursuit of
their business formed combinations, so that there was
but a single seller in effect. As the competition pre-
viously existing among the farmers' customers for cer-
tain of his products was destroyed by these combina-
tions, he was forced to sell at his sole customer's price.
Or, when he came to buy from the trust manufacturer,
he had to buy at the seller's price, fixed without com-
petition. The result was that in the one instance com-
modities were depreciated below their real value, while
in the other they were enhanced above their real value.
It was with this aggravated situation that the Legis-
lature came to deal in 1906. It was conceived that,
inasmuch as the most stringent laws did not effectually
prevent unlawful combinations of capital and re-
sources, it would have a tendency to counteract this
evil to put it in the power of those against whom it
was operating principally to protect themselves by
combining their products, so that by classifying,
grading, and handling them in large bulks it would
materially affect the general market of such commo-
dities, and better prices would be realized in spite of
the fact that there was but one buyer practically.
Hence the act of March 21, 1906. It is now contended
by appellee that that act allows the farmer to do
precisely what his adversary had been doing, and
which under the statute of 1890 was a crime. The
same argument was advanced in the case of Owen
County Burley Tobacco Society v. Brumback, etc.,
107 S. W. 710, 32 Ky. Law Rep. 916, which was a
proceeding before Judge Carroll of this court to dis-
solve an injunction. Sitting with Judge Carroll in

considering the validity and scope of the act of March 21, 1906, here involved, were all of the Judges of this court, with the exception of the writer of this opinion, who was absent. The opinion delivered by Judge Carroll may be said to reflect the views of at least a majority of the court. And in those views I desire now to express my concurrence. Construing the act of 1906, Judge Carroll said: "The act, although confining the privilege granted by it to farmers, does not in terms prohibit other persons or corporations from pooling their products, or from pledging them to an agent to dispose of. * * * If this act undertook to confer upon farmers the exclusive privilege of combining and pooling their crops to the end that a greater price might be obtained therefor, and expressly denied to other classes or persons the right to combine or pool their products for the same purpose, or if it should be so construed, it is plain that it would be in direct violation, not only of section 3 of the Bill of Rights, but of the fourteenth amendment of the Constitution of the United States." In the same opinion, construing section 198 of the Constitution and this statute of 1906, it was said: "To put it in another way, it would seem that, so far as this section is concerned, trusts, pools, and combinations, the only purpose of which is to obtain a fair and reasonable price for an article, are permitted. The Legislature could not enact a law legalizing a pool or combination of persons for the purpose of enhancing the cost of any article above its real value, yet it may legalize such pool or combinations as are created or organized for the purpose of obtaining fair and remunerative prices. * * * The act of 1906 does not authorize or permit a pool or combination to enhance the cost of crops above their real value. This

is not the proper construction, and, if it allowed owners to place the price of their crops above their real value, it would clearly be a violation of the Constitution.''

State Constitutions are limitations of power. While a Legislature may enact any statute not prohibited by the organic law, when it reaches that limit it must stop. It was because of that fundamental principle that it was said in the opinion last quoted from, that the Legislature was without power to authorize any set of men to enter into a combination to sell their combined property at greater than its real value. Looking again to that rule of statutory construction which presumes that the Legislature did not intend to enact a void statute, but that it intended to comply with the Constitution, it was also held in the case just cited that the legislative purposes was to ''enable the farmers to combine their resources and place their property in the hands of an agent selected by them, to the end that better prices might be obtained,'' but not ''for the purpose of enhancing the price of an article above its real value.'' That construction of the act of 1906 the court now adopts.

But if it should be conceded that the actual purpose of the Legislature was to authorize farmers to pool their property so as to get for it as much, and if possible more, than its real value, and holding, as we do, that such purpose would be in contravention of section 198 of the Constitution as to the latter purpose, still the act of 1906 would not be a nullity. So far as it was within the legislative power, it would be upheld, and the excess alone would be held invalid. An act of the Legislature of this State created the office of Prison Commissioners, defined their powers and duties and mode of selection, and fixed their term of office at six years. The Constitution forbade the creation of

any office by the Legislature with a term longer than
four years. The validity of the act came before this
court for determination in Commissioners of Sinking
Fund v. George, etc., 104 Ky. 260, 47 S. W. 779; 20
Ky. Law Rep. 938, 84 Am. St. Rep. 454. It was held
that the attempt to exceed the limit imposed by the
Constitution was void, but that the excess would be
rejected, and the act in all other particulars was up-
held, subject to that modification.

Construing the act of 1906 in consonance with sec-
tion 198 of the Constitution, the question, then is,
what is its effect upon the act of 1890? When two or
more statutes are enacted at different sessions of the
Legislature, all having the same subject, the rule is,
they are to be treated in pari materia. It is thus
stated in Sutherland on Statutory Construction, sec-
tion 238: "One who contends that a section of an
act must not be read literally must be able to show
one of two things.: Either that there is some other
section which cuts down or expands its meaning, or
else the section itself is repugnant to the general
purview. The question for the court is, what did the
Legislature really intend to direct? and this inten-
tion must be sought in the whole of the act, taken
together, and other acts in pari materia." It is not
the custom of Legislatures to declare their purposes
as such. Legislation is usually enacted from time to
time bearing on particular subjects. The courts pre-
sume that the Legislature intended all its enactments
on a given subject to constitute a consistent treatment
within constitutional limitations of the whole subject.
Provisions of the Constitutions are therefore to be
read in conjunction with such statutes, and all of
them, the provisions of the Constitutions, state and
federal, and the several enactments of the Legislature,

will be treated as a harmonious, consistent system, in preference to supposing that, literally construed, one is repugnant to the others, and some enactments in consequence wholly fail.

As, then, the Legislature had left the act of 1890 upon the statute books, and had enacted the one of 1906, upon the same subject, meaning by it to confer the right upon some to pool their property for the purpose and to the extent not forbidden by section 198 of the Constitution, we must construe these two statutes and the section of the Constitution together. And, in doing so, we must take into view the fourteenth amendment to the Constitution of the United States, as it also was presumably in the legislative mind in enacting the last statute. If it be construed that the Legislature intended a discrimination between farmers and all others, their enactment would be void. We must reject that view of it, if any other can be made to apply. If, however, it be construed that the act of 1906 operates to confer upon all persons the same benefits, as was intimated in the opinion in Owen County Burley Tobacco Society v. Brumback, supra, then there is no discrimination as that construction is possible under the language employed, and as it would sustain the validity of the act it must be adopted. It therefore follows that appellee and all others have the right under the existing laws in Kentucky to pool their property, or combine their capital and other resources, so as to get no more than the real value of their property when sold in the market.

But if it should be conceded that the legislative purpose was not to confer upon all others the benefits expressly given to farmers by the act of 1906, what would be the result? An attempted discrimination would result, it is true, but it would be ineffectual as

a law because of the operation of the fourteenth amendment to the Constitution. That article does not prohibit the State from enacting any measure it chooses favorable to any class of persons within its jurisdiction. Its effect is to act automatically upon the laws of the State, not to annul the State statute conferring benefits, but to raise the complainant class to the same level as that enjoyed by the favored class, securing to all the same benefits. A familiar application of this principle is in its invocation for the relief of persons of African descent from the effect of discriminatory statutes in their trial by jury. A single case will illustrate the application. In West Virginia a statute made white male persons alone eligible to jury service. A negro arraigned for a crime before a court of that State raised the question of the right of the State to try him by a jury impaneled under that statute. The Supreme Court held (Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664) that the State statute operated as a discrimination. It did not hold, though, that the negro could not be tried at all because of that fact, or that West Virginia was, because of the repugnance of its statute to the fourteenth amendment of the Constitution of the United States, without any statute on the subject of who was eligible to jury service in the courts of that State; but it held that members of the race discriminated against were, by operation of the amendment, entitled to the same legal privileges as to jury service that the more favored race was given by the laws of the State. It did not reduce the rights of the favored class to the plane attempted to be restricted to the unfavored one, but it elevated the lower to the level of the higher. Upon the same principle, the effect of the amendment upon the legislation in Kentucky

Commonwealth v. International Harvester Co.

against pools and trusts is not to efface all the enactments because they were discriminatory, if they were, but is to give to every one all the benefits conferred upon any one. The result would be the same as if, by construction as to the intention of the Legislature in enacting the statute of 1906, it was held by the courts of this State that the Legislature proposed giving all the benefits of that act to all persons, whether expressly named or not, and to that extent only had repealed or rather amended the act of 1890.

Appellee relies upon the opinion in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679. as sustaining the lower court in holding the act of 1890 void because of the subsequent act of 1906. In the Connolly case, Illinois had enacted a drastic anti-trust statute, but in one section excluded agriculturists from its effect altogether. No right was by the statute conferred upon the farmers. On the contrary that was made a crime if done by any person other than a farmer. The statute was not severable. Any combination, except that by farmers of the products of their farms, was penalized. There was no room in the statute for any construction save that of an attempted purposeful discrimination as against all others than farmers. The Supreme Court held that under the operation of the fourteenth amendment all others were entitled to the same protection by the laws of Illinois as the farmers were. As there was no instance in which the farmer who pooled his farm products would be punishable, it followed that in no instance could others be punished under the State statute for pooling their products. There is a wide difference between that case and the situation we have in hand here. We say that both our statutes apply to the farmer as well as to others, and that both

apply to others equally with farmers. There is no discrimination in intent, or in effect, as the statutes are construed and applied.

We are gratified in reaching this conclusion, as we are well satisfied that it more nearly comports with the fixed rules for construing statutes and our Constitutions, as well as more effectually carries out the real purpose of the Legislature, than by holding either that the act of 1906 is void, or that those vast aggregations of capital employed in monopolies that practice extortion in selling commodities to the public, and oppression in buying from the public, are unbridled upon the people of this State to do their worst without liability to punishment.

A final objection is urged against the construction being applied to these statutes, that, when read in conjunction with section 198 of the Constitution, as we have held they now must be, there is such uncertainty in them as to what constitutes a breach of the statutes as to render them void. This is supposed to be so, because, it is argued, there is no way of establishing the "real value" of an article that is fixed and certain; that one jury might say upon a state of facts that the accused was guilty, while another jury upon the same facts would pronounce not guilty; that the accused ought not in justice be left in such uncertainty as to the state of law, as to whether the law made his act a crime. The opinion in L. & N. R. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457, is relied on. Section 816, Ky. Stats., 1903, made it an offense for any railroad to charge or receive "more than a just and reasonable rate of toll" for the transportation of freight or passengers. That appellant railroad was indicted for having violated the statute. In holding the statute to

be unconstitutional, this court said: "There is no standard whatever fixed by the statute, or attempted to be fixed, by which the carrier may regulate its conduct; and it seems clear to us to be utterly repugnant to our system of laws to punish a person for an act, the criminality of which depends, not on any standard erected by the law which may be known in advance, but on one erected by a jury, and especially so as that standard must be variable and uncertain as the views of different juries may suggest, and as to which nothing can be known until after the commission of the crime." We are not disposed in this case to overrule or pinch away from any adjudged case of this court in order to sustain the conclusion at which we have arrived, nor to indulge in overnice distinctions. The principle announced in the L. & N. R. R. Co. v. Commonwealth, supra, may be literally applied with safety to these acts without impairing their validity in the least, or disturbing the full authority of that opinion. It will be noticed that it is not the uncertainty of what the juries may do in a case, nor the uncertainty of the courts, nor the uncertainty of the character of evidence upon which verdicts may be found, but it is the uncertainty "of the standard erected by law" that is the test.

There is a marked difference between the qualities of the "real value" of an article and "reasonable compensation" for a service. The latter may depend alone upon the opinion of the trier of the fact; the former is itself a fact susceptible of proof and exact ascertainment. It is not an open question in the criminal law of the land. For example, the larceny of a chattel worth less than $20 is in this State a misdemeanor; if more than $20 in value, it is a felony. Different juries might form different conclusions

upon the same facts. What they might do is pro-
verbially uncertain. Nevertheless the "standard
erected by law" is not uncertain; it is the market
value of the thing taken. So, hog stealing is a felony
in this State (section 1196, Ky. Stats., 1903) if the
hog taken is worth $4 or more. A hog worth $4 in the
market where taken might have been worth only $3
the day before, or $3 the day after. The market may
be fluctuating and uncertain, and the evidence, being
the opinions of witnesses dependent upon their mem-
ories, their opportunities for knowledge, their com-
petency to form a correct judgment, might be even
more uncertain. Nevertheless, "the standard erected
by law" is not uncertain. The "real value" spoken
of by the Constitution (section 198) is the market
value. The words were used as to things to be sold
and bought. It was known, of course, that sellers try
to get the highest price, and buyers want to buy at
the lowest price; that supply, demand, and competi-
tion are the principal factors in regulating prices.
Where the conditions are natural, the open market
would show the real value of any commodity. Where
they are not natural, where either supply, demand, or
competition are eliminated, or so controlled as to pre-
vent its operation upon the market, then the com-
modity may or may not realize its real value. On the
other hand, oversupply would reduce the selling value
to a level below the normal. If a concerted action of
producers resulted in only a normal supply of a com-
modity reaching the markets, the normal demand
would maintain normal prices. Such action is neces-
sary, or at least seems wise both as it affects the
producer and the general public. Violent depressions
of a market that result in heavy losses are hurtful to
everybody, because they tend to disturb the natural

equilibrium of business, and reflect harmfully, or are likely to, upon every other branch of commerce. The general public can not be benefited by disaster to any legitimate business. Conditions that are stable, assuring, and reasonably profitable are best for everybody. The object of the government should be to foster such conditions so far as within its power. Indeed, it is the unsettling of these conditions by one set of men who by their combined force break them down at some point, by oppressing their adversary in the business, bringing ruin upon him that they may gather extraordinary profits, that is the main evil of the so-called "trusts," and the one which the legislation we are now considering aimed to correct.

When the law endeavors to maintain the real value of an article, it has in contemplation the value of the thing as sold under ordinary, normal conditions, unaffected by any combination of producers or dealers whose object is to create an abnormal condition in that market. If it is argued that this is difficult of proof and uncertain, it must be answered that the difficulty of proving the existence of a fact can not be urged against the propriety of its being established. Nor is the standard uncertain. What the state of a market was immediately before an act, how it was affected by that act, the quantity of the commodity within reach of the market, the normal—that is, the usual—demand for it, are all facts susceptible of proof. They are in fact acted upon every day in the commercial affairs of the world; large business ventures are launched in reliance upon that identical evidence, and, in truth, upon it all commerce depends and is conducted. It is idle to say that that which everybody out of court can know, and does act upon as a fact, is too uncertain to be adopted as a standard,

or be susceptible of proof in court. What the "real value" of a thing is, depends upon probative facts; it is a matter not to be fixed, as is "just and reasonable compensation," but one that has already been established by markets open to all. Market value depends wholly upon proof of pre-existing facts, and therefore may be known at any moment by anybody. "Just and reasonable compensation," as used in the statute in the L. & N. R. R. Co. case, supra, had no necessary connection with any pre-existing fact, and therefore was insusceptible of being known in advance of its determination by the jury.

The application of this principle in law is not new. The Romans had laws based upon it. In 5 and 6 Ed. VI., a statute was passed punishing "forestalling" and "regrating," the first being the buying of merchandise or victual coming to market, or dissuading persons from bringing their goods or provisions there, and the latter was the buying of corn or other dead victual in any market, and selling it again in the same market, or within four miles of the place. "Engrossing was described to be getting into one's possession, or buying up, large quantities of corn or other dead victual, with intent to sell them again." Bl. Com. 155. That statute was repealed in the 12th year of George III. But Wharton in his Criminal Law says: "Entirely apart from these statutes, we must hold it to be indictable, on general principles of common law, to engross and absorb any particular necessary staple or constituent of life so as to impoverish and distress the mass of the community for the purpose of extorting, by terror or other coercive means, prices greatly above the real value." Wharton, Criminal Law, 1851. In Hale's Pl C., c. 80, it is laid down that to absorb, by fraud or corercion, all of a particular

class of staples, or currency, or labor in a community, so as to produce a dearth in any actual necessity of life, and in this way produce misery on one side and extortionate gains on the other, is undoubtedly an indictable offense. The common law confined the offense to an absorption of the necessities of life, whereas our statutes extend the principle to all articles of commerce; the common law made the crime depend upon the actors using fraud and coercion, while our statutes leave out those ingredients, as the act itself in its necessary effect is hurtful to society, and must have been known and intended by the perpetrators to be so; at the common law the result must have produced a dearth and misery upon the mass of people, while by our statutes it is enough if the result unsettles the usual balance of the market in that commodity, it being considered that in such state of case misery will be brought upon some members of society, and they are deemed by modern legislators as sufficiently important to the well-being of the whole body of the people as to warrant their protection; at the common law the final test was if the result brought the prices of the commodities greatly above their "real value," while under our statutes if the price is enhanced above or reduced below the "real value"— the offense is complete. It was competent and possible, then, to show the real value of corn and other necessities of life, and it is equally competent in law now to show the real value of any commercial commodity, and it is perhaps easier to prove the fact now than it was then.

The indictment in the case at bar should have stated that the purpose or effect of the alleged combination or pool which appellee is claimed to have entered into was to enhance the articles named in the

indictment above their real value. But as that was
not charged, the indictment was deficient, and the
demurrer was properly sustained.

It is therefore òrdered that the judgment be af-
firmed.

JUDGE HOBSON, dissenting. Judge Barker, Judge
Lassing, and I concur in the conclusion of the court
affirming the judgment appealed from; but we do not
concur in so much of the opinion as holds that prose-
cutions may now be maintained under the act of 1890.
The Legislature of Illinois passed an act similar to
our act of 1890, but by one provision of it exempted
from it agricultural products in the hands of the pro-
ducer. In Connolly v. Union Sewer Pipe Co., 184
U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, it was held
by the Supreme Court of the United States that the
act was void upon the ground that farmers were
exempted from its operation, and, therefore it could
not be enforced against any one. Our act of 1890 did
not exempt farmers from its operation, but the act of
1906 expressly authorized farmers to do what was
forbidden by the act of 1890. We are unable to see
that there is any substantial distinction between an
exemption of farmers in the original act, and an ex-
emption of them in a subsequent act. If the pro-
visions of the Constitution of the United States may
be evaded by putting the exemption in a subsequent
act and not in the original act, they amount to
nothing.

It is said, however, that the act of 1906, in so far as
it authorizes farmers to pool their products or to com-
bine together to raise the prices of their products
beyond their real value, is in conflict with the Consti-
tution of the State; and the act, therefore, being to

this extent void, it only authorizes farmers to combine to raise the prices of their products up to their real value.  And as farmers are not allowed by the act, when read in connection with the Constitution, to combine to raise prices above the real value of their products, the act of 1890 may still be enforced against those who combine to raise prices above the real value or to lower them below the real value.  The difficulty with this view is that the Legislature has not provided a penalty for combining to raise prices above the real value of the articles or to depreciate them below the real value.  By section 3915, Ky. Stats., 1903, all combinations, contracts, or agreements having for their object the fixing or in any way limiting the quantity of any article or commodity to be produced or manufactured, bought or sold, are declared illegal, and all persons entering in such agreements or contracts shall be deemed guilty of the crime of conspiracy. By section 3916; all arrangements made with the intent or having the effect to limit, fix, or change the price or production or sale of any article, or to restrict or diminish the output of any article, are declared illegal.  By section 3917, all persons violating the provisions of the act shall be punished by a fine of not less than $500, nor more than $5,000.  And by section 3919 if a corporation violates the provisions of the act, it forfeits its charter.  By section 3918 no action may be maintained to recover for the price of any article sold in violation of the act, or upon any contract made in violation of it. It is a very rigorous statute, and has been more than once construed by this court, the court holding that the question whether the combination or agreement raised prices above the real value of the article was immaterial; that the purpose of the statute was to

forbid all combinations to regulate, fix, or control prices, and to leave prices to be regulated entirely by the law of supply and demand. Commonwealth v. Grinstead, 108 Ky. 69, 55 S. W. 720, 57 S. W. 471, 21 Ky. L. R. 1444; Comth. v. Bavarian Brewing Co., 112 Ky. 930, 23 Ky. L. R. 2334, 66 S. W. 1016. What is the real value of the article is entirely immaterial under the act of 1890. The penalties denounced by that act are for the combinations referred to in that act. If the Legislature had had in mind providing a penalty for combination to raise the price of products above their real value, or to lower prices below the real value of the articles, it might have provided very different penalties from those named in that act. The fixing of penalties for offenses is strictly a legislative function, and the court should not make the penalty imposed for one offense apply to a different offense, which was not in the mind of the Legislature in enacting the act.

The Legislature realized that the farmers were confronted by an unusual condition ,and that the act of 1890 had failed of its purpose. So concluding, they determined to give the farmers a free hand, and to allow them to fight combination with combination. No one can read the act of 1906 (though he reads as he runs) without perceiving that the Legislature intended it to apply to corn, wheat, oats, tobacco, cattle, and all other farm products, and that they intended that the farmers should be entirely exempt from the operation of the act of 1890. Section 198 of the Constitution is not self-executing. The Legislature is left to determine when the necessity arises for legislation, and what legislation will best meet the necessity. This was expressly so determined in Commonwealth v. Grinstead, supra. Under the power thus vested in the

Legislature, it passed the act of 1906.  While it may be justly held that contracts in violation of section 198 of the Constitution will not be enforced because contrary to the public policy of the State as expressed in the Constitution, manifestly a criminal offense can only be created by legislative action.  We concurred in the opinion in Owen County Burley Tobacco Society v. Brumback, 107 S. W. 710, 32 Ky. Law Rep. 916, 128 Ky. 137, holding the act of 1906 valid.  But that opinion did not involve the question whether the two acts could both stand under the decision of the United States Supreme Court.

The Legislature had undoubted power to repeal the act of 1890, and it could do so without enacting any law in its place.  By the act of 1906, it did repeal the act of 1890, so far as farmers and their products are concerned.  Nothing is clearer than that the Legislature intended to wipe out the act of 1890 as to farmers and their products.  By the first section of the act, combinations and pools as to farm products are declared lawful.  By the second section of the act, it is provided that such combinations shall not be declared illegal or invalid.  The same idea is again expressed in the third section.  The fourth section declares that an emergency exists which requires the act to take effect from its passage.  See, also, Acts 1908, p. 38, c. 8.  The things which the act permits and which it declares shall not be illegal are the things which the act of 1890 made illegal.  The second act is therefore necessarily a repeal of the first act as to farmers and their products, and no prosecution can now be maintained under the act of 1890 for any combination of farmers in the selling of their products.  But under the decision of the United States Supreme Court, this repeal of the act of 1890 as to farmers operates to

repeal it as to all others. To say that the act of 1890 is still in effect in any respect as to farmers selling their products is to say that although the Legislature had power to repeal the act of 1890, and deliberately repealed it as to farmers, it is still in force as to them to some extent, which is only another form of saying that the Legislature could not repeal the act of 1890, as to farmers, although it undertook to do so. The cardinal error of the opinion lies in its ignoring the fact that the Legislature had power to repeal the act of 1890, and when that act was repealed as to farmers there was no law in force under which this prosecution may be maintained.

Under the rule now declared by the court, it will be a question for the jury in each case whether the combination raised the price above the real value of the article or lowered it below it. It will therefore be a question for the jury in each case what was the real value of the article. The people who make the combinations may suppose that the value which they fix is the real value, while one jury may come to one conclusion on the subject, and another to a different conclusion; so no man will be able to know whether he has violated the law until after he is tried. In ex parte McNulty, 77 Cal. 164, 19 Pac. 237, 11 Am. St. Rep. 257, it was well said by the Supreme Court of California: ''Before one can be convicted of a crime, there must be some rule of action prescribing with some certainty and expressing intelligently the sovereign will.''

By section 816, Ky. Stats., 1903, a penalty was imposed upon a carrier if he charged more than a just and reasonable rate of toll. Holding this statute void in L. & N. R. R. Co. v. Commonwealth, 99 Ky. 136, 35 S. W. 130, 18 Ky. Law Rep. 42 (33 L. R.

A. 209, 59 Am. St. Rep. 457), the court said:. "That the corporation has fixed a rate which it considers will bring it only a fair return for its investment does not alter the nature of the act. Under this statute it is still a crime, though it can not be known to be such until after an investigation by a jury, and then only in that particular case, as another jury may take a different view, and, holding the rate reasonable, find the same act not to constitute an offense. There is no standard whatever fixed by the statute or attempted to be fixed, by which the carrier may regulate its conduct, and it seems clear to us to be utterly repugnant to our system of laws to punish a person for an act, the criminality of which depends, not on any standard erected by the law which may be known in advance, but on one erected by a jury; and especially so as that standard must be as variable and uncertain as the views of different juries may suggest, and as to which nothing can be known until after the commission of the crime. If the infliction of the penalties prescribed by the statute would not be the taking of property without due process of law and in violation of both State and Federal Constitutions, we are not able to comprehend the force of our organic laws."

This opinion followed the decision of Judge Baxter in the L. & N. R. R. Co. v. Railroad Commission (C. C.), 19 Fed. 679. In Tozer v. U. S. (C. C.), 52 Fed. 917, Justice Brewer thus states the rule: "But in order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act can not depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty."

The same question came before this court in Commonwealth v. L. & N. R. R. Co., 46 S. W. 700, 20 Ky. Law Rep. 491, where the validity of section 818, Ky. Stats., 1903, was involved. That section imposed a penalty upon a carrier who gave any unreasonable preference to any person or locality, and the court there reaffirmed the rule laid down in the previous case. The soundness of these cases was recognized by this court in Commonwealth v. Grinstead, supra, where, in answer to the argument that the Legislature, in passing the very act in question, should have limited its provisions to combinations to raise prices above the real value of the article or to lower them below the real value, this court said: "Had it done so, there is strong authority in this State for holding that such an enactment, imposing a penalty for a combination to depreciate below its real value any article, would be held void for uncertainty."

The same principle was applied in Matthews v. Murphy, 63 S. W. 785, 23 Ky. Law Rep. 750, 54 L. R. A. 415, where the statute authorizing a physician's certificate to be canceled for unprofessional conduct was held void. In the same way, in Jackson ex parte, 45 Ark. 164, a statute was held void which punished any one who committed any act injurious to the public health or morals or the due administration of the laws. To same effect are Samuelson v. State, 116 Tenn. 470, 95 S. W. 1017, 115 Am. St. Rep. 805, and Cook v. State, 26 Ind. App. 278, 59 N. E. 489.

The real value of a thing is much more indefinite than the expressions used in any of the acts referred to. It may mean the cost of production plus a reasonable profit and allowance for the amount of money invested. But what is a reasonable profit, or what allowance should be made for investment, are too

indefinite to be made the subject of a crime, without any standard in advance by which the crime is to be determined. The expression by others might be taken to refer to the worth of the article to the consumer; that is, what can he make out of it, or what he could afford to give for it rather than to do without it. From this standpoint the expression is equally indefinite. From which standpoint a jury would look at the matter, and what they would consider a reasonable profit, would depend on the constitution of each jury. To say that the expression means the market value of the article when not affected by abnormal conditions is only to add to the confusion; for what are abnormal conditions, and who is to judge whether the conditions are abnormal? The market value of an article may be determined with some certainty, but what its market value will be under other conditions than those that exist, is spceulation pure and simple.

To steal is an offense. Statutes grading the punishment of the offense according to the amount stolen are universally in force. The value of the article stolen, though, in such cases is always determined by its market value, a thing which can be fixed with reasonable certainty. To compare with this the speculation as to what the market value of a thing might be under different circumstances than those existing, is for the court to shut its eyes to the principle upon which the rule of law rests. Where there is a question of market value or of ordinary care, it may be submitted to the jury in a civil or a criminal case, because there is no better standard that may be reasonably attained. But when you come to agreements raising or lowering the prices of products, it is very easy for the Legislature to define to what extent such

agreements shall be unlawful; for the Legislature may specifically regulate the subject, and it should not leave the law so indefinite that men may not safely transact their business. No one should be convicted of crime upon the mere speculation of a jury, after the act is done. To illustrate, the farmers of Kentucky recently sold a large quantity of tobacco at $16 a hundred. Can they all be indicted and convicted under the statute by a jury of persons, who do not produce tobacco, upon proof that the tobacco was not really worth more than $12, and could be produced at a handsome profit at that price? Again, the Society of Equity took its rise in the West, where the farmers pooled their wheat, refusing to sell it for less than $1 a bushel. If the farmers of Kentucky should make a similar arrangement, and fix the price at $1.50 a bushel, could they all be convicted under the statute upon proof that the price of what in the market under normal conditions would be less than $1.50? To so hold is simply to refuse to enforce the plain legislative intent in enacting the statute of 1906, and to hold that the act of 1890 is to some extent in force as to farmers when the Legislature expressly said it should not be in force as to them at all. The very purpose of all of these arrangements is to affect the market price. If they did not affect the market price, they would be useless. Under the rule laid down by the court, no one who enters into such an arrangement can now tell when he may safely go into the pool without violation of law. It will, in our judgment, create great confusion, disturb business, and engender litigation. It was not contemplated by the Legislature, and is not warranted by what the Legislature has enacted.

We, therefore, dissent from the opinion of the court.